**CALIFORNIA CANNERS &
GROWERS ASSOCIATION**

v.

**The UNITED STATES.**

**Congressional Reference No. 2–77.**

United States Claims Court.

Dec. 14, 1984.

OPINION

This Congressional Reference case concerns the removal from the marketplace of products containing the artificial sweetener "cyclamate" in the fall of 1970. This removal followed various administrative actions of the Food and Drug Administration (FDA) pursuant to the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. §§ 301–392 (1982)[1] which are the focus of this opinion. For purposes of context, the questions presented may be summarized as follows:

1. The modification of the FDA's GRAS (Generally Recognized As Safe) list, including:

 a. whether the modifications to the GRAS list complied with applicable procedures; and

 b. whether there was any reasonable basis in fact for these modifications.

2. The FDA's scheduling of the recall of existing products containing cyclamates from the marketplace, including:

 a. whether the schedule was promulgated in accordance with applicable procedures; and

 b. whether the schedule was reasonable and appropriate.

3. The FDA's characterization of cyclamates as carcinogenic, including:

 a. whether the agency action was within its statutory authority or discretion;

 b. whether the agency action was proper and reasonable or involved negligence on its part; and

 c. whether this action constituted misrepresentation or product disparagement.

4. The FDA's treatment of cyclamates as new drugs, including whether this action constituted actionable misrepresentation.

Julian B. Heron, Jr., Washington, D.C., for plaintiff; with Alexander Heron, Dickson Loos, Barry Roberts, Veronica Haggart, Leslie Shulman, Washington, D.C., Loyd McCormick, Susan Ogdie, San Francisco, Cal., Pope, Ballard & Loos, Chicago, Ill., McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Heron, Burchette & Ruckert, and John C. Hayes, Washington, D.C., of counsel.

Sandra P. Spooner, Washington, D.C., for defendant; with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, Washington, D.C., John C. Morland and William S. Liebman, Washington, D.C., of counsel.

JUDITH ANN YANNELLO, Judge:

## Contents

The record in this case was compiled by counsel in a most exemplary manner and consists of over 5,000 pages of transcript and 1,000 exhibits. Briefing included the proposal of approximately 1,500 findings of fact.

Correspondingly, this report is somewhat extensive, and is being issued in two separate volumes. *Volume I* is approximately 80 letter-sized pages of single spaced typescript consisting of: The Opinion on Liability and Damages; Appendix A: Discussion of Congressional Reference; and Appendix B: Statutory Provisions and Related Case Law. *Volume II* is approximately 200 pages consisting of: Appendix C: Findings of Fact on Liability and Findings of Fact on Damages; Appendix D: Other Scientific Studies; Appendix E: Glossary; and Appendix F: Further Statistical Analysis.

The Hearing Officer hereby designates Volume I for publication, believing Volume II to be of less general interest.

---

1. All subsequent references are to the current (1982) Code unless otherwise noted. The statutory provisions were not materially changed from those in effect at the time in issue unless otherwise noted.

5. Whether the recall of cyclamates constituted a taking of property without due process.

6. Whether the plaintiff's claims are cognizable as legal or equitable claims within the context of a Congressional Reference case, including whether the plaintiff's claims, as here asserted, exceed the scope of the instant reference.

Subsidiary questions are also presented.

## Outline of Facts[2]

Cyclamates and saccharin, two artificial sweeteners, have been on the market since the early 1950s. In those early days, artificial sweeteners, including cyclamates, were generally recognized as being efficacious in the treatment or mitigation of such medical problems as diabetes and obesity. Accordingly, in 1951 the FDA approved the drug application submitted by Abbott Laboratories (Abbott) to use cyclamates in products so as to meet the needs of consumers with special dietary requirements.

In 1958 the FDCA was amended so as to distinctly recognize a broad range of substances defined as "food additives". Cyclamates fell within the broad definition of food additives for general purpose use, as well as within the definition of a "drug". As a food additive, cyclamates could be marketed on a broad scale in dietary products for general consumers; its use was not limited to those with specific medical needs or problems.

Marketing dietary products containing food additives to general (non-medical) consumers was subject to FDA regulation under the FDCA. Marketers were required to submit a food additive petition to the FDA for its consideration and approval. If a product's use was not approved, it could be kept out of or taken off the market. In addition, the FDA was authorized to regulate *sua sponte* the conditions of use of products containing food additives. One exception to this regulatory process was decreed by Congress. Substances otherwise defined as food additives are not within the regulatory ambit of the statute if they are "generally recognized as safe" (GRAS) either by reputation within the scientific community or by actual prior use. (Similar provisions are found in the statute's treatment of drugs.) Cyclamates and saccharin were GRAS substances by dint of their prior use in limited drug markets and their reputation for safety.

In 1958 the FDA determined that, rather than review each of thousands of substances submitted for approval on an ad-hoc basis, it would promulgate a list of those food additive substances which it regarded as GRAS. Following the proposal and opportunity for comment thereon, the first GRAS list was published in 1959. Cyclamates were included in the FDA's list of substances it regarded as having GRAS status. At various times, scientists focused generally on the question of the safety of cyclamates, particularly as the market broadened and public consumption of products using these artificial sweeteners increased in the mid-1960s.

In 1968 and 1969, concern arose within the scientific community concerning the safety of cyclamates (particularly with respect to a laxative effect) given the large quantities then being consumed by the general public in soft drinks. Canned fruits and vegetables such as the Diet Delight brand marketed by plaintiff also contained some cyclamates as a sweetening agent. In April 1969 the FDA, spurred on by awareness of the public's increased consumption of artificial sweeteners, proposed a regulation establishing recommended daily allowances for the safe consumption of cyclamates.

During each of its fiscal years (FY) ending in May 1966, 1967, 1968, and 1969, plaintiff's sales showed an increase over the prior year's sales. In 1969, plaintiff's sales increase over the prior year was almost exactly as plaintiff had projected, reflecting an increase of about 14 percent.

**2.** The findings of fact (frequently involving complex scientific or medical data) are set forth in Appendix C. The facts will not be restated in this narrative except to the extent necessary for purposes of establishing a context for the present discussions.

The events during the next year, FY 1970, are here in issue.

Following the April 1969 proposal concerning recommended daily allowances of cyclamates, additional findings were reported pursuant to scientific studies conducted in 1968 and 1969 regarding the safety of cyclamates.

The studies included one from which preliminary data was first made available in mid-October 1969. This study was conducted by Dr. Oser at the Food and Drug Research Laboratory (FDRL), a laboratory not associated with the FDA or the Government. This study, referred to herein as the Oser Study, involved ingestion by laboratory rats of a mixture of cyclamates and saccharin. The results were examined particularly with respect to bladder tumors.

In October 1969, the FDA promulgated a regulation, effective immediately, removing cyclamates from its GRAS list, and further providing that products containing cyclamates as food additives designed for mass consumer markets would be phased out of the marketplace. The schedule which was promulgated, called for, *inter alia*, a complete phase-out of canned fruit and vegetable products containing cyclamates by February 1, 1970.

However, the FDA noted the continuing need for products containing cyclamates by "medical users", *e.g.* the obese or the diabetic. Since sales were made from an opening inventory of seasonal products, canned only in the summer and early fall, a shortfall in sales would leave plaintiff with a larger closing or accumulated inventory than would have otherwise been the case. Moreover, because many of the fruits and vegetables canned by plaintiff were seasonal in nature, and because in 1969 these crops were canned and artificially sweetened using cyclamate, there was no other product available for medical users. Without a cyclamate-containing product, these medical users would either have to forego consumption or use products containing a nutritive sweetener. Accordingly, the FDA stated that in the future, products containing cyclamates would be subject to the applicable drug laws.

During the next several months, further regulations were promulgated which modified and implemented the regulation of October 1969, beginning in November 1969, with an extension of the recall scheduled for canned fruits to September 1, 1970.

Moreover, in October 1969, FDA officials, including the Secretary of Health, Education and Welfare (HEW), issued public statements announcing that cyclamates had been found, in the study by Dr. Oser, to have induced cancer when ingested by animals in a laboratory experiment. As the parties have agreed, the experiment in question did not establish the carcinogenicity of cyclamates, since the test substance was a combination of cyclamate and saccharin.

Between the fall of 1969 and the summer of 1970, plaintiff and the FDA developed procedures for the treatment of cyclamate products as "new drugs". To this end, plaintiff submitted updated new drug applications required by the FDCA. The applications were submitted in short form, permitted by FDA regulations, known as an abbreviated new drug application (ANDA). During this period, the FDA issued regulations indicating its preparedness to approve the abbreviated applications and its decision to allow cyclamate products to remain in the market after the recall date where such applications were pending before the FDA. During 1970, the FDA approved several of plaintiff's pending ANDAs.

Plaintiff also developed a marketing plan to facilitate the continued sale of its cyclamate-containing products during the beginning of FY 1971 (June through August 1970), and, consistent with subsequent FDA regulations, after September 1, 1970. Plaintiff projected this marketing plan over two fiscal years and expected during that time to sell, at a rate of 1,775,000 cases per year (150,000 cases per month), the inventory of product it had accumulated as a result of low sales in FY 1969.

In August 1970, the FDA declared that cyclamates had no longer been found to be

effective as drugs. The FDA rescinded its earlier regulations which would have permitted the continued sale, beyond September 1, 1970, of cyclamate products for which abbreviated new drug applications had been submitted. Moreover, the FDA denied pending new drug applications for their use, and withdrew the approval it had previously granted to applications submitted by plaintiff.

With the rescission of the FDA's earlier regulations, and absent the FDA's approval either of applications for the continued marketing of cyclamates as new drugs or of petitions for their continued marketing as food additives, the products containing cyclamates could not remain on the market. At the time of the recall, plaintiff had an inventory of approximately 3,000,000 cases of product containing cyclamates.

## I. *Jurisdiction*

This case comes before the Chief Judge of the United States Claims Court pursuant to 28 U.S.C. §§ 1492 and 2509, and further, pursuant to Senate Resolution No. 225, referring the pending bill S. 1894 (95th Cong., 1st Sess.). The Chief Judge has referred the matter to the designated Hearing Officer pursuant to the Rules of the United States Claims Court (RUSCC). (*See* RUSCC Appendix D.)

The reference from Congress was received by the court on November 29, 1977. The petition was filed on February 17, 1978, and issue was joined with the filing of defendant's answer on May 18, 1978.

■ In a Congressional Reference case, it is this court's responsibility to set forth, for the information and convenience of Congress (which must ultimately make its own determination, taking into consideration all the factors), as full and detailed a report of its findings and recommendations as is practicable. For this reason, this Report, including the detailed findings of fact appended to this Opinion, will discuss all matters and issues which have come to the

attention of the Hearing Officer (whether through the contentions of the parties or *sua sponte* ), notwithstanding the fact that all issues discussed herein are not necessary to the ultimate resolution of the case.

## II. *Scope of Issues*

Our broad jurisdictional statute with respect to Congressional Reference cases directs the Hearing Officer to inform Congress whether plaintiff's demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due. The Hearing Officer's report should include:

> facts relating to delay or laches, facts bearing upon the question [of] whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.

Senate Resolution No. 225 requests the Chief Commissioner (now Chief Judge) to issue a report giving such findings of fact and conclusions as shall be sufficient to inform the Congress of the nature and character of the claim, legal or equitable, against the United States. The Chief Commissioner is directed to consider the circumstances giving rise to this claim "notwithstanding the bar of any statute of limitation, laches, or bar of sovereign immunity".

In this Congressional Reference case, the bill proposes to compensate plaintiff

> for losses sustained as a result of conduct . . . . . of the Food and Drug Administration during the period 1966 through 1970 relating to the classification, labeling, and use of cyclamates.

The reference, therefore, calls to our attention all conduct of the FDA during the period 1966 to 1970 with respect to classification, labeling, and use of cyclamates. This is a broad statement as to factual events which will fall within our purview.[3]

---

**3.** The instant case is thus different from *Marlin Toy Products v. United States,* 218 Ct.Cl. 630 (1978), in which the reference mentioned only the circumstances surrounding an editorial error by the Consumer Product Safety Commission (CPSC) in including a specific toy product on its Banned Products List. Because of the delimiting language in that reference, the Hear-

Moreover, the bill proposing compensation to plaintiff defines the conduct of the Government in issue as "including, *but not limited to,* misrepresentation whether negligent or intentional." (Emphasis added.) Thus, Congress in no way restricted the Hearing Officer's consideration of the factual circumstances involved here because the instant reference does not limit the type of Government conduct which may be examined.[4]

Apart from this language in the reference to the Chief Commissioner (now Chief Judge) and in the proposed bill to grant relief to plaintiff, some controversy has arisen in the instant case as to the particular nature of the claim which was presented to the Congress as contrasted with the claim now advanced by plaintiff. In addressing this controversy, the parties refer not only to the specific language quoted above but also to the statements made in testimony before Congress concerning the proposed bills; in short, what may be termed the legislative history of this reference. The Hearing Officer finds that the reference itself is sufficiently clear on its face without recourse to the surrounding legislative history. However, the following discussion of the parties' contentions concerning the reference and its history may also be helpful.

Defendant correctly notes that the legislative history of this reference suggests that Congress understood the plaintiff's primary contention, generally stated, to be that the FDA should have determined cyclamates to be unsafe at some time *prior to* October 1969.[5] Defendant urges that the Hearing Officer limit her inquiry to the events between 1966 and the fall of 1969 and determine whether FDA's action, in continuing to regard cyclamates as safe prior to October 1969, was in error.

The issue outlined by defendant is indeed among the issues to be addressed here. Although plaintiff did not focus on this issue at trial, the record does contain some evidence from which to form a conclusion on these issues. Thus they will be fully addressed herein.[6]

Plaintiff now stresses that the FDA's error occurred principally in its October 1969 actions whereby cyclamates were labeled not only unsafe, but carcinogenic when tested by ingestion in laboratory animals. In short, plaintiff now contends that the FDA's conduct in October 1969 was not

---

ing Officer properly refused to extend his consideration to the issue of the adequacy of the CPSC's earlier testing of the product. The reference in the instant case is not limited to any particular event within the four-year period under consideration.

4. The instant case is thus distinguishable from *Lance Industries Inc. v. United States,* 3 Cl.Ct. 762, 763 (1983), in which the reference was limited to a consideration of the damages directly and proximately resulting from that conduct by the Government which constituted "negligent transmission and publication of false information concerning [plaintiff's] principal product." The reference in the instant case does not so limit the circumstances which the Hearing Officer may address.

5. As will be discussed later in this opinion, plaintiff's harvesting and canning cycle was such that by the fall of each calendar year its inventory for the remainder of the fiscal year was established. Thus, a determination that cyclamate-containing products lacked safety made prior to the canning season of any given year would have been helpful to plaintiff in

determining what sweeteners to use in that canning process. However, had a determination of unsafety been proper in any given year only after the canning had been completed, plaintiff may well have faced a situation similar to that which was in fact encountered in this case.

Thus, if the claim were as stated by defendant it would be necessary, in order to find that plaintiff has been wrongfully damaged, to determine not only the year in which the alleged unsafety of cyclamates should have been determined, but indeed the precise month.

6. With regard to the period prior to October 1969, the only precise period which has been addressed by the factual evidence in this case is the month of April 1969. Accordingly, the situation as it then existed is discussed in the Opinion in a clearly captioned subheading. Other periods for which some scientific data has been introduced are also individually discussed to the extent practicable in order to enable Congress— which bears the ultimate authority and responsibility for any legislation enacted to grant relief to plaintiff—to benefit from this Report to the fullest extent consistent with the intent of its reference.

warranted at an earlier time or indeed even when it took place.

Defendant contends that these and similar allegations by plaintiff are beyond the scope of the reference to the Chief Judge. The Hearing Officer does not agree with defendant's contentions. While the thrust of plaintiff's position before the court may differ from what it apparently presented initially to Congress (perhaps as a result of information garnered during discovery and pretrial preparation in this action), nonetheless the crucial inquiry is whether its arguments fall within the terms of the Congressional Reference itself.

In this case, the issues referred to the court by Congress are expressed in very broad language. The terms of this bill are sufficiently broad (both in terms of the factual circumstances and relevant time periods surrounding the Government's conduct and the characterizations of such conduct) to encompass the issues now raised by plaintiff. The court finds that in addition to the issues raised concerning the FDA's failure to act prior to the fall of 1969, the issues otherwise raised by plaintiff are within the scope of the reference to the court (even if such other issues were not specifically addressed before Congress).

Thus, the Hearing Officer will explore both the events and data prior to the fall of 1969 (which defendant urges are, alone, mandated by the reference from Congress) and also the issues concerning the propriety of the FDA's determinations ultimately issued in October 1969, as well as the FDA's later actions during the period 1969 to 1970 (as urged by plaintiff).

### III. *Definition of a Claim*

Congress has asked for a report setting forth all the facts necessary to determine whether plaintiff has a claim, legal or equitable, or whether any recovery would constitute a gratuity. In Appendix A to this Opinion, there appears a detailed discussion of the definitions of claims, legal and equitable, as construed in a number of Congres-

sional Reference cases heard in this court (or its predecessor, the Court of Claims). This discussion should be read in conjunction with the Opinion but need not be restated here.

Suffice it to say that at the time in issue certain of plaintiff's allegations may have formed the basis of a legal claim under the FDCA, the Administrative Procedure Act (APA), and the Federal Tort Claims Act (TCA).[7] These claims and the scope of available relief must be examined.

Similarly, the extent to which plaintiff did or did not pursue such claims, and the consequences of any such failure, must be examined to determine the impact, if any, upon recovery. In a like vein, it must be determined which such statutory claims might now be considered as equitable if such bars as laches or limitations were to be set aside.

Likewise, claims such as those in the nature of a tort must be examined to determine whether sovereign immunity or exceptions to the TCA, which might bar recovery on a legal claim, could nonetheless be set aside in this Congressional Reference so as to form the basis of an equitable claim.

Finally, the facts and events surrounding all of the claims and allegations must be examined to determine whether recovery on an equitable claim would be consonant with a moral obligation by reason of the fault of, benefit to, or interest of the Government.

### IV. *Events Through 1965*

Cyclamates were introduced into the market in 1951. At that time they were used as artificial sweeteners in foods consumed principally by a limited number of people with medical problems. Saccharin had been in similar use since the early 1900s. A substance used in this way was recognized as a non-prescription drug, subject to Government regulation under the FDCA. Accordingly, an application to market cyclamates as a new non-prescription drug was made to and approved by the FDA. The main effect of such Govern-

---

7. The relevant terms of these statutes are set forth in detail in Appendix B.

ment regulation, insofar as consumer marketing was concerned, was a labeling requirement advising consumers that use of products containing cyclamates should be limited to those who must restrict their intake of sugar or other nutritive sweetener.

The law changed somewhat in 1958. At that time, the FDCA was amended to include within the FDA's regulatory ambit substances described as "food additives". These were substances added to or used in the processing of foods either for general all-purpose consumption or for special uses such as dietary products. Cyclamates and saccharin were substances used in foods for an expanded non-medical consumer market. However, the statute also provided that a substance would be exempt from such regulation (*i.e.*, would not fall within the definition of a food additive) if it were generally recognized as safe (GRAS) within the scientific community or, for substances in use prior to 1958, based on actual experience. Hundreds of such substances were then on the market. Among the substances entitled to status as a GRAS substance, based on the then prevailing scientific data as well as actual experience, were cyclamates and saccharin. The GRAS status of cyclamates was not only founded in data and experience, as is concluded herein, but was also recognized by the FDA.

The FDA, at the time of these statutory changes, recognized that considerable confusion might exist concerning the status of many common substances then in use. If the substance was not considered to be GRAS, it would be an additive subject to FDA regulation and, in that case, a petition would have to be filed with the FDA for permission to market the substance. The FDA, anxious to avoid receipt of hundreds, if not thousands, of petitions which were unnecessary because the substances were actually entitled to GRAS status, promulgated a regulation which proposed to establish a GRAS list maintained by the agency itself. In short, the purpose of the GRAS list was to clearly identify those substances which were, in the agency's own view, exempt from agency regulation.

After receiving comments, the regulation and the GRAS list were promulgated. If a substance was not on the list, its marketer could nonetheless establish that it was entitled to GRAS status and hence was beyond the FDA's regulation of additives. Similarly, if a substance were on the list, a challenge could be made to its GRAS status. The regulation provided, however, that no substance could be removed from the list without notice.

The evidence establishes that cyclamates were entitled to GRAS status through 1965, and that they properly remained on the agency's GRAS list throughout this period.

### V. *Events from 1966 to 1968*

The use of products artificially sweetened with cyclamates and saccharin for non-medical dietary purposes increased steadily during the late 1960s. Both sweeteners could be used in soft drinks, the consumption of which was increasing particularly. Only cyclamates were suited to the canning of fruits and vegetables because the process involved the application of heat, for which saccharin is ill-suited.

A series of scientific experiments had accompanied the increasing use of artificial or non-nutritive sweeteners during the 1960s. In 1967, a Fact Sheet prepared by the FDA noted that artificial sweeteners were being consumed in ever-increasing quantities. In fact, products sweetened in this way were no longer being principally used by those with medical problems, but were being consumed by the public generally, primarily for reasons of cosmetic weight control.

The FDA found that such sweeteners, and particularly cyclamates, had not been found to endanger human health in any way. In very large doses, such as 5 grams, a slight laxative effect was produced. The principal source of cyclamate consumption at the time was in soft drinks. One 12-ounce bottle of soft drink contained only about one gram of cyclamate. Thus, acceptable levels of total consumption could be easily maintained.

The court concludes that the FDA's 1967 fact sheet was in accord with the scientific data at the time. Moreover, at this time cyclamates continued to be recognized, by the FDA (and by the scientific community and through actual experience), as GRAS. The court concludes that this recognition was also appropriate, based on available medical and scientific data at the time.

The legislative history of this Congressional Reference includes a mention of the hearings conducted in 1966 by the House Committee on Government Operations concerning artificial sweeteners. Defendant argues that this history suggests that as early as 1966 there existed a genuine difference of opinion among qualified experts regarding the actual safety of cyclamates. The court does not accept this contention for a variety of reasons.

First, there is no evidence as to the actual data submitted to that committee. Second, from the data available through 1968, which has been introduced before and examined by this court, it is concluded that at that time the reputation for safety of cyclamates was not significantly questioned. Any questions which did arise dealt primarily with the total intake level of consumers. Studies which might have raised more serious questions were found lacking in probity.

Thus, it is concluded that through 1968, cyclamates retained their GRAS status and were properly retained on the FDA's GRAS list.

## VI. *Events in Early 1969*

In December 1968, the FDA again issued a Fact Sheet concerning cyclamates. The FDA had requested a review of existing studies by, among others, the National Academy of Science and the National Research Council (meeting as one) (NAS/NRC and hereinafter referred to as NAS). Such reviews were underway at the time this sheet was issued. An interim report had been issued in November 1968. This interim report suggested that all ongoing studies be scrutinized, and noted particular attention to the question of acceptable daily intake levels for consumers of this now widely-used artificial sweetener. The Fact Sheet noted that results of these studies and evaluations thereof were being awaited.

Based on a review of the scientific and medical data and studies available at the time, this court concludes that the reputation of cyclamates as GRAS remained intact through 1968, and the FDA appropriately retained that substance on its GRAS list.

By early 1969 some of the studies were reported; however, by reason of deficiencies in the design or execution of the experiments, they were not viewed as scientifically probative concerning the safety of cyclamate. Thus the reputation of cyclamates as GRAS continued. However, due to the possibility of a laxative effect resulting from ingestion of excessive amounts of cyclamates, it was proposed that a recommended daily intake level be established. In order to take into consideration the consumption of artificially sweetened products by both children and adults, the intake levels which were recommended were based on milligrams of cyclamate per kilogram of body weight (mpk).

In April 1969, the FDA promulgated a proposal to establish a maximum tolerance level of 70 mpk or, alternatively, no more than 3,500 milligrams of cyclamates per day for an adult. Marketers of cyclamate-containing products would be required to provide appropriate consumer information on the labels of their products to educate the consumer. The proposal made no mention of any change in the inclusion of cyclamates on the agency's GRAS list. Indeed, a number of substances were included on that list with statements as to maximum tolerance levels. A period was provided for comment upon this proposal. However, after receiving and considering many such comments, the FDA did not promulgate the proposed regulation.

The acceptable daily intake levels recommended by the agency, if adopted, would have posed no difficulty to plaintiff. It was fully prepared to include the requisite

information on its labels. Moreover, its canned fruits and vegetables contained very small amounts of cyclamates (about 155 milligrams in an average serving of one-half cup of canned peaches) and therefore could easily be consumed without approaching the maximum recommended levels. Indeed, a 12-ounce soft drink might contain 1000 milligrams of cyclamates and the average adult still could consume three such bottles per day and almost three one-half cup servings of canned peaches.

Given the quantity of cyclamates in the consumer products and the acceptable intake levels, the FDA was not, at that time, attempting to regulate the cyclamate content of products as was the case in *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688 (2d Cir.1975). Indeed, so long as products contained appropriate label information as to content for consumer education, the agency proposed in 1969–70, to refrain from any regulation of the substance as a food for special dietary use under the provisions of 21 C.F.R. § 125.7 (with the provisions of that regulation being then the subject of scheduled public hearings).

The Government urges that this proposal was, in effect, a proposal to remove cyclamates from the GRAS list. That contention lacks support in the terms of the proposal itself and in the very nature of the regulation. Mere establishment of maximum daily intake levels was not without precedent in the case of a GRAS-listed substance.

Nor is there any support for the contention that at this time the overall safety of cyclamates was seriously questioned. The actual experience of its use in humans without adverse effect (if not consumed excessively) continued from its introduction in 1951. The scientific community produced no probative data which would call its safety into question.

Only one other aspect of cyclamate use was scientifically questioned at the time. Specifically, questions were raised over the extent to which a cyclamate substance contained its metabolite, cyclohexylamine.

The agency proposed to limit the amount of cyclohexylamine to 25 parts per million (ppm) of cyclamate and proposed a formula for measuring this content. Only those products containing cyclamate with more than the proposed 25 ppm of cyclohexylamine would be subject to possible regulatory action by the FDA.

Here, too, such standards, limitations, or restrictions, were not unusual in substances which continued to be listed on the FDA's GRAS list. Moreover, the cyclohexylamine content of CCG's products was within the proposed restriction.

Thus, the proposals of the spring of 1969 did not detract in any way from the continued reputation of cyclamates as GRAS substances. Their inclusion on the FDA's GRAS list through this time was appropriate.

## VII. *Events in Late 1969*

Prior to the fall of 1969, there had been many studies of cyclamates and of saccharin. As the focus of these studies indicated, they reflected a continuing interest in, but no firm conclusions about, the effects and safety of these substances. The results of these earlier studies, while of some interest and suggestive of further studies, were viewed by the scientific community as lacking in probative value. Indeed, just a few days before the October 1969 promulgation in issue here, officials of the FDA had publicly reassured consumers of the safety of cyclamates.

There were two additional scientific developments in the fall of 1969 which focused attention on a re-evaluation of the general reputation for safety which cyclamates theretofore enjoyed.

The first of these developments was the completion of two studies by FDA scientists, Drs. Verrett and Legator. These studies were not designed as carcinogenicity studies, but rather to study the teratogenicity and mutagenicity of cyclamates. The FDA determined that a full evaluation of these studies was called for and that, if the results were found to be probative,

action might be appropriate toward removing cyclamates from its GRAS list.

In the fall of 1969, the FDA asked that a meeting of the NAS/NRC be convened, at which the results of the Verrett and Legator studies would be presented. The committee was to comment upon and evaluate these results. A two-day conference was scheduled for mid-October, during most of which the Verrett and Legator studies were the focus of attention.

However, in the view of these NAS scientists, based on the evidence then available, both of these studies, while of interest, suffered from deficiencies in design or execution which deprived them of any probative value.[8]

The second new scientific development concerned the Oser Study. On October 13 and 14, 1969, the FDA was advised by Abbott Laboratory of some preliminary results of the Oser study. The study took two years and was designed to study the carcinogenicity of a mixture of cyclamate and saccharin (in the proportion used in a commercial table-top sweetener "sucaryl"). A preliminary report of the progress of the study had been published in March 1968, at which time cyclohexylamine had not yet been introduced into the study.

The FDA was presented with some slides prepared from the Oser Study test animals. In addition, Abbott furnished the FDA with a brief or summary report of the study referred to as the Price Report.[9] These materials were reviewed in a piecemeal fashion by various individuals designated by the FDA.

In addition, this material, including the Price Report, was presented to the NAS/NRC in the last hours of the conference convened to consider the Verrett and Legator studies.

At the time in issue, no one individual had examined all of the slides furnished by Abbott. Indeed, these slides represented only a portion of those finally prepared in connection with the official report of the study. Reports of detailed pathology were unavailable. There was no published material describing in detail the design and protocol of the study, nor of the conditions and environment in which it was conducted. The results of the study were fully evaluated, and the study complete, when a full report prepared by Dr. Oser was furnished to Abbott Laboratories in late 1970. A full report was subsequently published in 1975.

The examination of the partial and preliminary slides revealed the presence of tumors or carcinomas. The results were determined by NAS to be statistically significant; and based on the brief descriptions in the Price Report, the Oser Study was considered to be probative. These findings were confirmed in the data contained in the final full report prepared by Dr. Oser; additional pathological examination, for example, confirmed the presence of tumors in statistically significant numbers.

The official report of the NAS/NRC Committee was prepared, as requested by the FDA, immediately after their review of the preliminary Oser data on October 17. The report, signed by the committee chairman was dated October 17, 1969.[10]

8. For example, the Verrett study involved chicken embryos, with no known mammalian correspondence. The Legator study employed the *in vitro* technique as opposed to the preferred ingestion method.

9. This report was prepared in mid-October 1969 by Dr. Price of Abbott, and consisted of several pages. Dr. Price also collaborated with others, including Dr. Oser, in November 1969, in the preparation of an article which was published in February 1970. The article was about three pages long and contained some of the same information and results set forth in the Price Report.

10. The official committee report was furnished to an NAS official, Dr. Handler, who in turn formally furnished it to the FDA under a cover letter dated October 24, 1969.

The author of the cover letter forwarding the official committee report was not a member of the committee to whom the preliminary Oser Study data were presented on October 17. Moreover, his comments in the cover letter were stated as resulting from a discussion only with the chairman of the committee and not with the many other eminent scientists who participated in the meeting of October 17. Finally, the chairman of the committee testified

The Committee, in its official report, noted that the results were statistically significant and that the test substance (cyclamate/saccharin) had been found to be carcinogenic. The Committee further suggested that the cyclamate might have been the active substance and thus further study was indeed indicated to ascertain the affect of cyclamate alone. Because saccharin was also present in the test mixture, its effects or contribution to the test results could not be ignored. Concern also existed about the effect of the introduction of cyclohexylamine into the test substance during the study.

The Committee's Report did not make a finding that cyclamates were carcinogenic (but rather limited this finding to the test substance of cyclamate/saccharin). The committee was not asked to make and did not make any recommendation as to administrative regulatory action (such as removing cyclamates from the GRAS list). The Committee did conclude that further testing was appropriate to determine the effect of cyclamate ingestion alone.

In a report a few weeks later on the Verrett and Legator studies, the NAS Committee submitted its statement on saccharin safety and urged that prior studies of saccharin be reevaluated and that saccharin too be subjected to tests of modern design for carcinogenesis. (NAS had made a similar suggestion in its 1968 Interim Report.)

The FDA had scheduled a press conference on Saturday, October 18, 1969, for the purpose of reporting on the NAS/NRC

evaluation of the Verrett and Legator studies. That evaluation confirmed the lack of probity in their results. With the advent of the Oser Study preliminary data, however, the FDA's announcement on that date was of far greater significance.

The FDA and its officials at the highest levels took action in essentially two different modes. First, the FDA took regulatory action concerning the marketing of certain cyclamate products. Second, the FDA issued press releases and public statements concerning cyclamates. Both actions must be examined in detail and their separate and combined effects noted.

VIII. *Regulatory Action: The FDCA and the APA*

We turn first to the FDA's regulatory action, announced first at a press conference on October 18, 1969, and confirmed a few days later by a regulation published in the *Federal Register* and effective immediately. Because of the results of the Oser Study, the FDA took the following action.[11]

First, cyclamates as added to dietary foods consumed by the general public, were no longer accorded GRAS status by the agency and were removed from the FDA's GRAS list. Without GRAS status the substance was subject to FDA regulation as a food additive.[12]

Second, given the absence of any approved food additive petition, at least at that time, cyclamate-containing canned fruit and vegetable food products intended for general consumption could no longer be marketed within the guidelines of the stat-

---

that the comments in the cover letter did not reflect his or the Committee's views.

Moreover, there is no evidence other than that summarized above, as to when or how the FDA became aware of the committee's findings to which they refer in their October 18 and 21 announcements. In the absence of such evidence, it is presumed that the FDA was aware of the committee's statement which had actually been prepared on October 17—before the FDA's announcement. It is likewise presumed that the FDA was unaware of the content of the forwarding cover letter dated October 24—after the FDA's announcements.

For all of the reasons noted here, the evaluation of the information available to support the FDA's announcements and promulgation of Oc-

tober 21 must focus on the actual and official committee report and not the forwarding cover letter.

11. As noted, the Oser Study was the only study at the time which was viewed by the scientific community as probative.

12. Cyclamate products, conforming to the drug laws for non-prescription drugs and relabeled (so as perhaps to advise only limited use by persons with a medical problem or under a doctor's supervision) could remain on the market, thus returning to and retaining the status recognized in 1951 at the time of their introduction into the market.

ute, and could be seized by the FDA as adulterated foods. The FDA thus implemented a recall from the market (initially scheduled for completion by February 1970 but extended to September 1970 shortly thereafter).

The removal of cyclamates from the FDA's GRAS list had far reaching implications. The most important was the inclusion of cyclamates, unprotected by GRAS status, within the definition of a food additive and thus subject to FDA regulation. Such regulation required that the marketer submit, and the FDA approve, a food additive petition if the product was to remain on the market.

The FDA's promulgation of October 1969 clearly constituted regulatory action; such action is required to be accomplished through certain statutorily prescribed procedures. There was a complete disregard for those procedural requirements.

The Government argues that this was not regulatory action since the GRAS list was only designed as an advisory or informational tool. That may be true insofar as a marketer could argue that the product was, in fact, generally recognized as safe, if not by the FDA then at least, as required by the statute, within the scientific community. Such argument might be advanced in connection with any attempt by the FDA to seize a particular product or to regulate or recall products on an industry-wide basis. The matter would then be decided by a court.[13]

However, it is also true that so long as the FDA acknowledged that a substance had GRAS status, it was beyond the ambit of the FDA's regulation of food additives. (Indeed, it was for the very purpose of preventing submission of numerous food additive petitions to the FDA for permission to market GRAS substances, that the FDA first promulgated this list.) Accordingly, removal of a substance from the GRAS list would subject the substance to agency regulation (which, in turn, would be subject, to any judicial review which a marketer might pursue to contest such a regulation).

Moreover, coupled with the FDA's removal of cyclamates from the GRAS list was its directive that they be removed from the market (insofar as they were intended for use in dietary foods by the general public as opposed to medical users). The scheduling of a recall was an industry-wide provision in lieu of initiating individual seizure actions against each separate product. Thus, the import of the removal of cyclamates from the GRAS list is clear and not in the least speculative.

▪ It has long been recognized that a regulation of the type in issue here, which subjected cyclamates to FDA authority, is of a type requiring notice and comment. *See National Nutritional Association v. Weinberger*, 512 F.2d 688 (2d Cir.1975).

In short, it is found that the GRAS list was an important element in the FDA's regulatory scheme and any removal of a product from that list, rendering it subject to regulation, constituted regulatory action. *See*, generally, Appendix B.[14] Proper procedure required that a proposal first be

13. *See* Appendix B regarding the statutory provisions, with related case law, and the discussion therein of GRAS substances, noting the different judicial review procedures for single product seizures and for industry-wide recall regulations.

14. Indeed, throughout the instant proceeding the Government has argued that plaintiff should have protected itself by filing a food additive petition seeking agency approval for the continued marketing of cyclamate—a procedure which would only be meaningful if the FDA indeed had regulatory authority.

A determination on such a food additive petition could be expected to take some time. In fact the FDA took seven years, from 1973 to 1980, to issue a final decision on Abbott's cyclamate petition.

In connection with any protective petition, it is noted that there is no evidence whatever that the Government would have permitted the continued presence of cyclamates in products intended for use by the general public (as opposed to its non-prescription drug use by those with medical problems) so long as such a petition was pending. Continued use was allowed only for cyclamates intended for drug use pending approval of ANDAs.

promulgated, with an opportunity for interested parties to comment and then, and only then, could a final regulation be issued.

Here, the FDA's October 1969 promulgation was effective immediately upon publication. The FDA effectively removed cyclamates from its GRAS list with no notice or opportunity for comment. In addition to violating the procedural requirements discussed above which generally obtain in actions of this sort, this hasty procedure was also contrary to the FDA's own procedural regulation which required notice before a substance was removed from the GRAS list.

The Government argues that the procedural requirement extends only to notice, not opportunity for comment, and was met by the lapse of a weekend between the press announcement and the regulation's promulgation. This argument is specious for a variety of reasons.

■ Where, as here, notice is required, clearly the notice must be meaningful (particularly as coupled with an opportunity for comment). In this respect, the two-day weekend intervening between the FDA officials' public announcements and the promulgation of the regulation is certainly not adequate. In other similar contexts, and in the absence of a health threat, the FDA afforded at least a 30-day notice period. (It should be noted that the notice relied on by the Government was through press channels and not through official publications such as the *Federal Register*. Moreover, the FDA's official promulgation was effective immediately upon publication.)

Finally, it is noted that the practice now suggested by the Government does not comport with the way in which the GRAS list was initially promulgated nor with the way in which prior modifications were proposed and implemented (including the way in which the April 1969 tolerance levels were suggested, which proposal provided ample notice and permitted considerable comment).

Therefore, the FDA's October 1969 announcement was clearly in violation of applicable procedures with respect to notice. Rather than being immediately effective and final, it should have served as no more than a proposal for future promulgations. Promulgation of a final regulation should have awaited, at the least, receipt and consideration of the comments of interested parties.

■ The statutes also require that any proposal to issue a regulation contain a statement of the underlying bases or reasons. The statement in the final regulation should be of sufficient detail to permit judicial review. Indeed, if the bases or data are insufficient to support the regulation, it may be set aside by the courts. (*See* Appendix B for a full discussion of the applicable statutes.) In this case, the FDA relied upon the results of the Oser Study and the comments by the NAS Committee for its conclusion that cyclamates were no longer GRAS.

While certain limited preliminary data was available in the fall of 1969,[15] the full 200-page report, prepared by Dr. Oser and furnished to Abbott, was not available until November 1970.

The plaintiff now complains that the regulation was promulgated without due regard to requisite process.[16] It complains that it had no opportunity to comment be-

15. The preliminary findings of the Oser Study and the NAS Committee official report thereon, as well as the Price Report, were a matter of public record as the result of another proceeding in *Nehi-Royal Crown Beverage Co. Inc. v. Finch*, No. 19,975 (6th Cir.1969). The availability is relevant; whether this material was actually part of the FDA's administrative record is not relevant here.

16. Plaintiff also contends that the ultimate recall of its product from the market constituted a

taking for which plaintiff has not received just compensation. This argument fails. The individual seizure or industry-wide recall of a product (*i.e.*, the denial of market access in the public interest) does not constitute an appropriation of the property for public use. (Plaintiff was free to, and did, dispose of the property in other markets.) There is no claim cognizable under the Fifth Amendment. *See Meserey v. United States*, 447 F.Supp. 548 (D.Nev.1977).

fore the final regulation removing cyclamates from the FDA's GRAS list was issued. However, this contention is now unavailing.

There were a number of provisions requiring that the agency regulatory action be accompanied by an opportunity for comment, hearing, and for judicial review. (*See* Appendix B.) The courts were available to enforce adherence to the requisite procedures as well as to obtain judicial review of substantive action. Plaintiff failed to avail itself of any of these avenues of recourse. Plaintiff cannot complain of a lack of due process when the established procedures were more than adequate, and when plaintiff simply failed to request enforcement of those procedures.

Plaintiff might also complain that promulgation of the final regulation should have awaited not only receipt of comments from interested parties but also completion and availability of the full report on the underlying scientific study. Finally, it might complain, based either on the preliminary or the full data of the Oser Study, that such study did not in fact support a removal of cyclamates from the GRAS list.[17]

Indeed, promulgation of a final regulation could well have been stayed until appropriate procedures had been followed and, perhaps, until the full Oser Study data was available. In the instant case, for example, the probity (or lack thereof) of many studies has been established only upon full examination of such factors as design and protocol, survival rates, dose responses, and many other elements.

Plaintiff's failure to pursue available remedies might itself be viewed as contributing to the circumstances of which plaintiff now complains. The plaintiff contends that this failure to act was due to its belief in the correctness of the agency's regulatory action at the time.[18] This was not an improvident view, particularly as we have found the regulatory action to have been warranted and supported.

Based on the entire record assembled here, it is most unlikely that any action by plaintiff would have altered the ultimate results. In short, the agency's regulatory action was, as plaintiff had contemporaneously believed, substantively correct and would not likely have been significantly changed.

The final report of the Oser Study results, completed in November 1970, furnished ample justification to question the safety of the test substance and both of its components, cyclamates and saccharin, until their separate effects could be further studied as was recommended by the scientists. Thus, in late 1970 there was sufficient basis for a removal of cyclamates, *inter alia*, from the FDA's GRAS list. Products containing cyclamates intended for use in dietary foods consumed by the general public (as contrasted with medical users) would, deprived of their GRAS status, have been food additives subject to FDA regulation. Pending further administrative regulation, such as consideration of any food additive petitions, such products would properly have been recalled from the market.

The only difference might have been that, rather than the recall becoming effective on September 1, 1970, it could have been postponed until, at least, shortly after November 1970.[19]

---

17. The Oser Study provided the only data upon which the FDA's removal of cyclamate from the GRAS list could be based because it was the only probative study (of the combined test mixture). Earlier studies of cyclamate and of saccharin had been undertaken but were not viewed by the scientific community as being probative. These studies did, however, focus the scientific interest in continued testing to evaluate the safety of artificial sweeteners.

18. Plaintiff also contends that it intended to continue its sales of cyclamate products to its medical users under the drug laws, and hence anticipated no ultimate loss. (The market plan relied upon was not formed nor justified, however, until early Spring 1970.) In any event, it is clear that any future changes in market circumstances with respect to cyclamates drug status are separable from the events of the fall of 1969.

19. The FDA in fact allowed several months to elapse between its October 1969 promulgation

To the extent that the September 1, 1970, recall date may have been slightly premature, foreclosing the sale of plaintiff's cyclamate products a few months sooner than might otherwise have been appropriate, plaintiff cannot now be heard to complain inasmuch as it failed to pursue the remedies available to seek a stay or postponement of such regulation. The effect, upon any legal or equitable claim, of plaintiff's failure to pursue its remedies will be discussed further in this opinion as appropriate.

### IX. *Regulatory Action: The Tort Claims Act*

Any legal claim for a monetary award to compensate plaintiff for the foreclosure of its commercial market would have to be cognizable under the Federal Tort Claims Act (TCA).[20]

 First, it is noted that the absence of due care or, put another way, the presence of negligence in regulatory action by an agency can be actionable at law unless the function involved is discretionary. In the instant circumstances, the function of defining what constitutes "safety" of a food additive might well be discretionary—with Congress having exercised some of this discretion by enacting the Delaney Amendment.

However, certain evaluations, even if involving scientific or medical judgment, might well require the exercise of due care.

It might well be that the evaluation of the Oser Study data and the diagnosis of the results caused by the test substance is just such a matter requiring the exercise of due care. *See, e.g., Hendry v. United States*, 418 F.2d 774 (2d Cir.1969); *Beins v. United States*, 695 F.2d 591 (D.C.Cir.1982); *Ware v. United States*, 626 F.2d 1278 (5th Cir. 1980.) *See generally* Appendix B.

The damages for which recovery may be sought must result from the agency's regulatory action; here such action involved the classification of cyclamates and the resulting recall. As noted, the FDA did not comply with all procedural requirements and may have acted somewhat prematurely. But shortly after the release of the full report of the Oser Study in November 1970, cyclamates' loss of GRAS status, and classification as a food additive requiring FDA approval prior to being marketed, was to be expected and was supported by the evidence.

Thus, the specific agency regulatory action of which complaint might be cognizable under the TCA—the classification and recall of cyclamates—was appropriate.[21] This action furnishes basis for recovery by plaintiff neither as a legal or an equitable claim.[22]

 Apart from the consideration of negligence, a second, more specific, aspect of the TCA is relevant here. The tort of

---

and the actual recall in order to provide, *inter alia*, a continuing market for medical users. On the other hand, the October 1969 promulgation could have been treated (by the courts, pending notice and comment) as a proposal, amply justified by the Oser Study preliminary data, calling for a final regulation (and proposed recall) when a full report was released and if the Oser Study preliminary results were confirmed. Having been given the notice of this intended action as early as October 1969, the final regulation might well have called for a complete recall immediately or just shortly after its promulgation.

20. Appendix B contains a thorough discussion of the TCA.

21. The FDA correctly classified cyclamates as no longer GRAS. For purposes of the TCA and FDA's actual regulatory action, it is of no rele-

vance that the agency also incorrectly considered cyclamates to be carcinogenic.

22. If plaintiff had a claim, it would not be precluded for the reason of its failure to pursue any FDCA or APA remedies. Such exhaustion of remedies is not required by the TCA; the courts would take into consideration the effect of pursuit of these remedies and what might have been accomplished. Here, had plaintiff availed itself fully of all avenues of recourse, the resultant regulation would nonetheless have been properly issued. (Only a slight change in timing might have been expected.) Thus, plaintiff's failure to pursue these remedies is of no import here in persuading against recovery.

Similarly, as plaintiff has no legal claim on the merits, laches considerations do not come into play.

slander (or, here, more properly of product disparagement) might be alleged.[23] Any legal claim is foreclosed by the doctrine of sovereign immunity, specifically *not* waived by the TCA. This may, however, be disregarded in this Congressional Reference case.

■ If such a suit against the Government were to be viewed as a suit between two private individuals, *i.e.*, without any such immunity, even then an equitable claim by plaintiff must fail. An essential element in a claim for product disparagement is specificity of the product addressed. *See, e.g., Marlin Toy Products v. United States*, 218 Ct.Cl. 630 (1978); *see also Lance Industries Inc. v. United States*, 3 Cl.Ct. 762 (1983); *Sperling & Schwartz, Inc. v. United States*, 218 Ct.Cl. 625 (1978). *See generally* Appendix B.

Here the FDA's characterizations were of cyclamates generally, not plaintiff or its product specifically. As fully discussed in Appendix B and the cases cited therein, the absence of such specificity would preclude any tort claim for product disparagement even if suit were brought against the Government as if between two private parties. *See, e.g., Ajay Nutrition Foods Inc. v. FDA*, 378 F.Supp. 210 (D.N.J.1974), *aff'd. mem.* 513 F.2d 625 (3rd Cir.1975).

With respect to the FDA's regulatory action, there is no basis here for recommending recovery as an equitable claim.

## X. *Regulation of Drugs*

When cyclamates as artificial sweeteners were first introduced into the market, they were non-prescription drugs used primarily for the benefit of "medical" users, *i.e.*, those such as diabetics and the obese, who were required for medical reasons to restrict their intake of nutritive sweeteners or sugars. A drug application for cyclamates was submitted pursuant to the FDCA and was approved by the FDA in 1952.

Under the FDA, drugs can be marketed if they are found to be safe and efficacious. The definition of safety in this context does not include provisions similar to the Delaney Amendment with respect to food additives. Rather, the drug use recognizes a "risk-benefit" approach in the cure, treatment, diagnosis, or mitigation of disease.

In 1958, the statute provided for regulation of substances added to foods intended for general consumption or for dietary use by consumers generally (not limited to those with medical problems but extending to those who wished to regulate their weight for, perhaps, cosmetic reasons). The use of artificial sweeteners increased steadily through the 1960s. In the fall of 1969 the FDA ordered, as described in detail above, that, effective September 1, 1970, all cyclamate-containing products intended for dietary use by the general public were to be removed from the market.

In this same order, the FDA provided that cyclamates could remain on the market to the extent they conformed to the applicable drug laws. Thus, cyclamates essentially returned to and retained their initial non-prescription drug status.

Throughout late 1969 and 1970, the FDA promulgated additional regulations concerning the medical or drug use of cyclamates. For example, the FDA provided that application for their continued use could be made on an abbreviated form. Moreover, the FDA gave assurances that it was prepared to approve these applications. This assurance represented the FDA's, and the scientific community's, continued recognition of the safety and efficacy of cyclamates as an artificial sweetener for those with medical problems necessitating a restricted intake of natural sugar.

---

**23.** Another specific tort, misrepresentation, has been touched on in this case but, as is thoroughly discussed in Appendix B, is not appropriate here with respect to the regulation of cyclamate-containing dietary products intended for general consumption inasmuch as a necessary element for such a claim—reliance by plaintiff on the Government's (mis)representations—is lacking. (The representations with respect to cyclamates intended as drugs for medical users are discussed in a subsequent chapter of the opinion.)

Moreover, the FDA anticipated the submittal of a vast number of ANDAs for drug use of cyclamates as artificial sweeteners. While FDA approval was assured, the timing (given a recall date of September 1, 1970) was a factor. Therefore, the agency assured the continued presence of cyclamates in the market, even after September 1, 1970, by further providing that a product could remain available for sale, even if an ANDA had not yet been approved, so long as an ANDA had been submitted and proper labels affixed to the product. This, together with the assured approval of applications, gave rise to the general belief that there would be no difficulty in continued sales of cyclamates to the more limited market designated as "medical users".

So as to inform medical users of current developments, the FDA also ordered that certain labels be affixed to the products containing cyclamates indicating the contents (as well as certain measurements of the metabolite cyclohexylamine) in addition to stating the general caveat that the product was intended for use only by those with medical reason and under medical supervision. Plaintiff anticipated no difficulty in this regard and undertook preparation of such labels.

At the time in issue, plaintiff had submitted many of the requisite ANDAs for its individual products (canned peaches, canned pears, and so forth). Many of these applications were pending, but some had been approved by the time in question.

The new developments concerned accepted daily intake levels of cyclamates. As noted above, in April 1969, the question had been addressed and it was proposed to advise consumers, through appropriate labels, that consumption should be limited to about 3500 milligrams per day for an average adult. This limitation was sufficiently high to permit continued consumption of plaintiff's products together with consumption of numerous soft drinks. Plaintiff's products contained about 155 milligrams in an average serving of one-half cup, or about 300 mg in one cup, while soft drinks contained as much as 1000 milligrams in a 12-ounce bottle.

In November 1969, the Medical Advisory Group on cyclamates (MAG/C) again considered the matter and, in a report published in February 1970, recommended maximum intake levels of 780 milligrams. This would be less than the level of a 12-ounce soft drink, but other artificial sweeteners such as saccharin were available for use in soft drinks. However, saccharin could not withstand the heat treatment used in the canning process; thus only cyclamates, which could withstand heat, were appropriate for use in plaintiff's products. The newly suggested intake level, however, would still permit consumption of several average servings of those products.

During the summer of 1970, the FDA suggested that the MAG/C reconvene to study the matter of tolerances and recommended intake levels. As a result of this suggestion, the group convened on August 4, 1970, and, in a report furnished to the FDA in mid-August, recommended that the daily intake level be reduced to 168 milligrams. Thus, a medical user could consume approximately one average serving (one-half cup) of plaintiff's product per day.

The group further equated the sweetening power of this amount of cyclamate to that of 5.1 grams of sucrose. In essence, the use of cyclamate was replacing an otherwise anticipated use of about 5 grams of sugar. The group therefore concluded that a saving of this amount of sucrose was not substantial and that the benefit of cyclamate as a sweetener had virtually disappeared.

There is insufficient evidence to challenge the propriety of the MAG/C computation of acceptable daily intake levels. The findings of the group and of the FDA in this regard are supported by the record. There is, however, no evidence as to whether the group or the FDA considered the desires of consumers (apart from pure scientific or medical evaluation). For example, if total sucrose intake were to be limited or restricted (such as by diabetics), the use of plaintiff's products would allow

them one additional serving of an artificially sweetened product while at the same time preserving the "sweet taste" lost or reduced by waterpacks.

On August 14, 1970, the FDA made an announcement that cyclamates were no longer efficacious as drugs. On August 27, 1970, the FDA promulgated a regulation reversing its former position and providing that, after September 1, 1970, cyclamate-containing products would not remain on the market as drugs for use by those with medical problems.

■■■ To the extent that this revoked the approval previously granted to certain of plaintiff's pending ANDAs, this practice was procedurally defective in that the statute requires that withdrawal of such approval be accompanied by notice and an opportunity for a hearing. This was not provided here. *See* 21 U.S.C. § 355(e) and Appendix B re: Statutory provisions.

Had plaintiff availed itself of its right to enforce applicable procedures, it is possible that the actual recall might have been postponed slightly beyond September 1, 1970.

The Government contends that these procedures concerning notice and comment applied only to long-form applications, not to ANDAs. Indeed, the statute does not address ANDAs; however, the FDA has authority to provide that the short-form may be used where the long-form is unnecessary. There is nothing which distinguishes the procedural requirements for the withdrawal of approval of an ANDA from the requirements for withdrawal of approval of the long-form application.

The statute requires that notice and opportunity for a hearing be provided whenever the FDA determines that an application is deficient or that the evidence does not establish the safety or efficacy of the product. Similar notice and opportunity for hearing is required when the approval previously given to an application is to be withdrawn. Defendant offers no rationale for disregarding this clear statutory scheme merely because the FDA determined that a shorter form of application

may be used. Therefore, it is determined that such notice and hearing were required here.

Again, as in the case of the October 1969 promulgation, the FDA acted precipitously. It promulgated a regulation which was effective immediately, and which was preceded by a few weeks notice in the form of a media press release. No meaningful opportunity for public comment was provided.

Here too, as with the October 1969 action, plaintiff took no steps to seek judicial review and a stay of the regulation until applicable procedures were followed. However, given the substantive correctness of the FDA's action, little was lost by plaintiff's failure to insist on this point except, perhaps, a short postponement of the recall.

Thus, on September 1, 1970, cyclamates were recalled not only from use in dietary foods for the general public but also from the drug market where used by those with medical need.

Here, as in the case of the October 1969 promulgation, plaintiff did not seek to stay the effectiveness of the regulatory action and recall until adequate procedures had been complied with. Here, too, however, all of the evidence now assembled establishes that these procedures would have been to no avail (except to the extent that some additional time may have been gained which can be taken into account in computations of any recovery which is recommended).

In the end, the FDA's decision to recall cyclamate products intended for drug use by those with medical problems is, on review, supported by the evidentiary record here assembled, particularly the recommendations of the MAG/C. Thus, the regulatory action in recalling these products is found to be substantively correct.

The foregoing discussion has focused on the FDCA and the APA aspects of the FDA's regulation of cyclamates as drugs. The Tort Claims Act aspect should also be discussed. A claim of misrepresentation might be raised; in this Congressional Ref-

erence in which sovereign immunity may be disregarded, such a contention would be cognizable as an equitable claim.

Plaintiff relied upon the FDA's assurance of future marketing of cyclamate products under the drug laws. For example, plaintiff expended time and money in obtaining appropriate labels and in preparing and submitting the necessary applications for FDA approval. In the end, however, the change in the status of cyclamates as drugs, with their effectiveness negated, resulted in their being recalled from the market as products intended for use in the treatment of disease.

Although the element of reliance may be present here, there is no misrepresentation. The program announced by the FDA at various times was entirely consonant with the scientific data and the status of cyclamates at each such time. The program changed only as the data changed. There was at no time a *mis* representation of the situation or the anticipated program given the information then available.

When the FDA determined to implement the previously-unexpected recall of cyclamates as drug products, the data fully warranted such action.

The only relevant question might be why, when the data apparently led the FDA to begin to question its pre-announced program as early as June 26 and July 1, 1970, it did not announce any change officially until mid-August 1970. However, given the plaintiff's harvesting and canning season, there is insufficient evidence here assembled to establish that an earlier announcement would have altered plaintiff's FY 1971 market plans (as, for example, in acquiring more non-cyclamate inventory for sale that year).

Accordingly, there is no basis under the TCA to recommend recovery here as an equitable claim even were the government's sovereign immunity to be disregarded.

## XI. *Publicity; Non-regulatory Action*

The foregoing discussion has focused on the FDA's regulatory action and its order that cyclamate products be recalled from the market.

Cyclamates added to foods intended for consumption by the general public were no longer entitled to GRAS status and were properly removed from the FDA's GRAS list. Thus, cyclamates were subject to FDA's regulation. As substances for which no food additive petition had been approved cyclamates were properly recalled from the market. The FDA promulgated a regulation in October 1969, modified by a regulation in November 1969, which called for this recall some 10 months later or by September 1, 1970.[24]

Cyclamates in foods used in the manner of a drug, intended for consumption by those with medical problems requiring limits on their intake of nutritive sugar, had been found to be no longer efficacious in the treatment of disease and hence they, too, were properly recalled from the market. The regulation promulgated in Au-

**24.** This extended schedule was a proper exercise of the FDA's discretion, noting that there was no imminent threat to the public health or safety; that there was a need by medical users for products such as canned fruits and vegetables; and that the availability of such products was on a seasonal basis. (The schedule was also discussed with other countries.)

The Government contends that it had a right to order the recall immediately, or contemporaneously with its regulation. However, it is not at all clear, on the record here assembled, that such precipitate action would have been a proper exercise of the FDA's discretion.

Moreover, as has been found in earlier sections of this opinion, no final or effective regulation with respect to cyclamates as food additives would have been sustained upon judicial review until the underlying data was fully available (*i.e.*, until late 1970 when the full report of the Oser Study was available). A regulation calling for recall of cyclamates as drugs would not have been sustained until the data was available to support a finding that they were no longer effective in the treatment of disease (and this too was not until the fall of 1970).

Thus, the recall date of September 1, 1970 (while perhaps slightly premature in the case of food additives) was appropriate and there is here no basis upon which to support an earlier date.

gust 1970 called for their recall effective within weeks, by September 1, 1970.[25]

Thus, the FDA's regulatory action was proper (if in some cases slightly premature) and any damage to plaintiff as a result of the recall and consequent foreclosure of market opportunity as of September 1, 1970, does not give rise to either a legal or an equitable claim.

However, as has been discussed above, the only proper rationales for this regulatory action were as follows. First, cyclamates intended for use in dietary foods consumed by the general public were no longer entitled to GRAS status, as suggested by the preliminary data of the Oser Study in late 1969 and confirmed by the final report in late 1970. (Cyclamate safety was being questioned; at no time had cyclamates been associated with any health or safety hazard to humans and at no time did the regulations identify cyclamates as *unsafe*. Rather, the available data suggested that further study and testing was appropriate.) Second, cyclamates intended for use as a drug by those with a medical necessity were no longer effective in the quantities which the scientific community computed to constitute acceptable daily intake levels.

These were the bases set forth in the regulations in support of the regulatory action. Coupled with these appropriate conclusions, however, was the conclusion by the FDA's highest officials that cyclamates had also been found to cause cancer in animals. While this conclusion was not necessary to the regulatory action (and was not specifically addressed in the regulations), it did lead to a number of public statements and press releases addressing the question of cyclamates far beyond the rationale for the regulatory action.

The publicity engendered by the FDA is of great importance here. Such publicity

was not necessary to the regulatory action in recalling cyclamates from the marketplace some 10 months after the first announcements. It served only to inform the consuming public. Its effects, nonetheless, were extreme.

It must be emphasized that, during the period from October 18, 1969 to the recall date of September 1, 1970, plaintiff was free to sell its cyclamate products. This was in accord with the FDA's regulations governing the cyclamate recall and its own perception of an administratively appropriate schedule. The issue here is not the ultimate closing of the marketplace to cyclamates in late 1970 or the inability to commercially market accumulated inventories of cyclamate products after that date. Rather the concern here is the sales after October 1969 and prior to the recall date. There was a sharp decline in sales which contributed to an unusually large accumulation of inventory by the time of the recall.

The FDCA authorizes the FDA to publicize the results of its own investigations and studies and also those studies conducted by others where there is an imminent threat to public health and safety. The Oser Study was not conducted by the agency itself and it is clearly acknowledged that its results did not suggest any imminent threat to either the public health or safety. Nonetheless, it is concluded that the Government had an interest in keeping the public apprised of such scientific developments as the Oser Study and had every reason to publicize these results in the public interest.

Neither the FDCA nor any other statute provides for relief at law if a party is aggrieved by such publicity. There are, in short, no remedies to be exhausted and no action at law that an aggrieved party could

---

25. Here, too, the FDA ignored certain procedural requirements for notice and hearing. Enforcement by plaintiff, through recourse to the courts under the FDCA and APA, might have postponed somewhat this recall date insofar as cyclamate products used for medical purposes were concerned. In the end, however, the resultant recall would have been implemented.

The effects of failure to achieve some postponement have been discussed in detail in the chapter of this opinion concerning regulation of drugs. Suffice it here to reiterate that consideration of this failure on plaintiff's part can be adequately taken into account in computing the recommended recovery if any.

have resorted to complain of or prevent this publicity.[26] The content of the Government-initiated publicity is therefore a matter of great concern.

The difficulty in this case is with the content of the public statements and press releases of the FDA and its highest officials. Where test results are to be publicized, the publicity should at the least be accurate. Here the FDA repeatedly reported that cyclamates had been found to have caused cancer when ingested by laboratory animals. But cyclamates had not been found to have caused cancer—only the test substance of cyclamates and saccharin had been found to be a carcinogen. The agency's statements were clearly erroneous and wholly lacking in support.[27]

No one had found cyclamates to be carcinogenic; yet the FDA continually misrepresented the input it was receiving from groups of scientists. For example, the FDA repeatedly announced that the carcinogenic findings were also those of the NAS/NRC Committee. This was wholly inaccurate. The committee's official report and conclusions, prepared under somewhat hurried circumstances on October 17, 1969, to which the agency referred in its October 18 public statements and its October 21 regulation, were simply that the test substance—the combination of cyclamates and saccharin—had been shown, with statistical significance, to have induced cancer. The committee noted the possible role of cyclamates and suggested further testing to determine whether it was in fact the active substance in the test result. (A few weeks

after this report, the committee furnished a report on saccharin and suggested that it too be subjected to further testing for carcinogenesis, as NAS had suggested in its 1968 Interim Report.)

Nor did the committee report recommend that cyclamates be removed from the FDA's GRAS list as the FDA continually represented. In fact the committee was not asked to comment upon such administrative/regulatory action and, according to its chairman, would not have offered such comment even if asked. Indeed, the committee did not even comment on cyclamates' GRAS status within the scientific community.

The defendant has failed to introduce any evidence supporting its contemporaneous statements that the NAS/NRC Committee had found cyclamates to be carcinogenic and recommended that they be removed from the GRAS list.[28]

The Government argues that if it had not provided this publicity, others would have. But the evidence is otherwise. When Abbott Laboratories, which had commissioned the Oser Study, released its statement in October 1969, it noted clearly that the data then available was only "preliminary" and that the results "appeared" to be inconsistent with the previous findings of cyclamate "safety". At no time did Abbott say that cyclamates had been found to be carcinogenic.

That the consuming public responded to these statements by the Government is also without question. The situation here is

---

26. The absence of any legal recourse in this regard makes it unnecessary to discuss the issue of laches. The plaintiff, and the industry, did endeavor to petition Congress for redress of their grievances (the only relief available) immediately upon the late 1969 developments and thus the Government may be said to have been given notice of the industry's belief in their entitlement to indemnification for the losses it sustained.

The generality of the publicity—referring only to cyclamates and not to plaintiff or its products specifically—would preclude any action at law even against a private party. *See Ajay Nutrition Foods, Inc. v. FDA*, 378 F.Supp. 210 (D.N.J.1974), *aff'd mem.* 513 F.2d 625 (3rd Cir.1975).

27. This is not a situation where the agency's statements were well-founded at the time but were viewed later, perhaps on newly discovered evidence, as having been erroneous. Instead, this is a situation where the agency's statements were incorrect and without support of any kind even at the time they were being made.

28. A cover letter forwarding the NAS Committee official report is quoted in defendant's proposed findings. The defects in this cover letter are many, and are discussed in detail in the findings of fact. Suffice it here to note that the letter is dated October 24, several days after the action taken by the agency.

clearly unlike that found in *Sperling & Schwartz, Inc. v. United States,* 218 Ct.Cl. 625 (1978). Here sales dropped suddenly and dramatically immediately after the Government's statements. No other cause has been cited or shown to have accounted for this phenomenon. Moreover this consumer reaction was specifically attributed to the Government's statements as indicated in a poll wherein over 90 percent of those interviewed, all of whom used dietary products, manifested an awareness of the fact and content of the Government statement.

Indeed, some 43 percent of those polled believed most or all of what the Government said about cyclamates' carcinogenicity (with 49 percent believing some, little, or none). A few months after the dramatic drop in sales immediately following the Government's announcement, sales had recouped somewhat but only to about 50 percent of reasonably anticipated levels. Thus, the consumer response was not only initially dramatic but was sustained.

Finally, the Government contends that some shortfall or decline in sales might be expected even if only related to a change in cyclamates' GRAS status and the recall of cyclamate-containing product. This is a reasonable hypothesis. However, it is entirely speculative, with no evidence having been introduced by which to measure expected consumer response in this or any similar circumstance.

Moreover, indemnification for losses incurred by marketers when the state of the art improves, and reveals defects heretofore unknown, is not unheard of. *See, e.g.,* Federal Insecticide, Fungicide and Rodenticide Act, (FIFRA), 7 U.S.C. § 136m, in which indemnification was statutorily provided; *see also* TRIS Indemnification Act, Pub.L. No. 97–395, 96 Stat. 2001 (1982). Thus, even if we were here concerned only with the newly-breaking scientific developments and changing status of GRAS, the possibility of indemnification is not automatically foreclosed in an equitable claim.

Here, however, we have an even stronger case. The Government did not merely announce proper regulatory action and changing status of cyclamates. It also characterized cyclamates as carcinogenic, without support. More than a changing state of art was involved here. The Government's erroneous characterizations also played a role in contributing to the decline of plaintiff's sales. The Government should not benefit, in an equitable claim, from the fact that it is impossible to separate the losses which might be expected to have resulted from correct and accurate announcements from the losses which were in fact sustained as a result of wholly incorrect and unwarranted charges by the Government.

It is in the public interest and to the public's benefit that the Government engage in such publicity to keep consumers advised of scientific and medical developments and questions concerning a product's safety. Thus, such publicity is to be encouraged. At the same time, however, the marketers of any product should not, in all justice and fairness, be forced to sustain and absorb the losses incurred as a result of erroneous Government statements, particularly those which are wholly unwarranted and carelessly issued.

It is the conclusion of the Hearing Officer that this is a situation in which a Government activity (publicity) benefits the public and is in the Government's interest but which, faultily performed by the Government, has resulted in damage to the plaintiff. There is fault on the part of the Government here, but in a context in which no legal claim would lie against a private party. Moreover, the public benefits by and the Government has an interest in such publicity generally, which here gave rise to plaintiff's damages. In short, plaintiff has an equitable claim based on moral obligation. (*See* Appendix A.) The fact that the events here would not give rise to any legal claim or indeed to any claim even if brought against a private party, does not preclude plaintiff's recovery based on an equitable claim, recognizing the moral obligation of the United States. Accordingly, such recovery is hereby recommended.

In short, it is concluded that the publicity initiated by the FDA, to the effect that cyclamates had been found to have caused cancer in laboratory animals, was the direct cause of a consumer avoidance of plaintiff's Diet Delight Products and the direct cause of a significant sales' loss during FY 1970 and early FY 1971. Specifically, the inability to sell some 57 percent of the inventory plaintiff had accumulated from October 1969 to the recall of September 1, 1970, is found to be the result of the Government's adverse and incorrect publicity. Plaintiff should be compensated for these losses as an equitable claim based on the moral obligation of the United States.

## XII. *Damages*

It has been recommended that plaintiff should recover for the losses sustained due to inventory accumulations (which could not later be marketed after the recall) as a result of the consumer response to the Government's publicity about the carcinogenicity of cyclamates.

The matter of computing the amount of this loss and the resulting amount of damages is, in this case, somewhat difficult. The computations are discussed in far greater detail in the Findings of Fact, and are summarized below.

▆▆ The sales lost as a result of normal business, market, or economic function (and also any shortfall occasioned by concern over cyclamate during the summer FY 1970) are not recoverable here. Similarly, sales lost as a result of the regulation and its scheduled recall are not recoverable.[29] Both of these considerations have been taken into account in the findings.

The parties have not thoroughly analyzed the nature of plaintiff's losses and the apportionment of damages. Plaintiff

has asserted that all of its losses were attributable to wrongful Government action. The Government has contended that, since plaintiff was sustaining sales losses in any event, it is entitled to no recovery. In this Report, and as detailed in the findings, an attempt has been made, to the extent possible, to make such analysis. This painstaking analysis is described in detail in the appended findings and will not be restated here.

It has been determined that approximately 57 percent of plaintiff's accumulation is attributable to the circumstances surrounding the Government's action and announcements concerning cyclamates in October 1969 (as opposed to any other market or economic phenomenon or pre-October cyclamate developments). Again, as noted in the preceding section, since there is no basis in the record to determine how much of this cyclamate-related accumulation would have resulted even from accurate publicity (as opposed to the publicity generated by the Government linking cyclamates with cancer), this entire accumulation will be laid at the Government's door.

Moreover, as also discussed in the previous section, the accumulation here, unlike that in *Sperling & Schwartz, supra,* has been clearly shown to have resulted from the adverse and unwarranted Government publicity and thus its recovery here is appropriate.

The accumulation of the entire inventory of 3 million cases (and its eventual disposal, for salvage, on other than a consumer market) caused plaintiff to sustain certain losses. Specifically, as a result of its inability to market its inventory, plaintiff sustained a loss of $8,156,757 representing the value of the inventory on hand.[30]

29. As discussed in previous sections of the opinion, had plaintiff availed itself of its rights under the FDCA or the APA, little difference in end result would have been achieved. Thus, plaintiff's failure to seek such relief was of no moment. In this one particular, however, it should be noted that if the recall date were slightly premature (coming a few months before the availability of the final report on the Oser Study and only weeks after the change in drug status),

plaintiff cannot be heard to complain inasmuch as plaintiff failed to seek a postponement of the recall date for these reasons and thus failed to preserve its market for a short time after the scheduled recall date.

30. This amount, and many which follow, relate to the expenses incurred for the entire accumulated inventory of 3 million cases. As such, these expenses should be apportioned between

Plaintiff also sustained losses, in connection with its entire inventory, of the following nature: $211,305 for the value or cost of fibre cases; $426,590 for labels; $334,660 for warehouse labor and expense; $535,058 for freight and distribution; $4,933 for materials and supplies; $54,218 for disposal cost and destruction of some of the accumulated inventory; $136,066 for property taxes; and $21,400 for insurance.

The total of these items is approximately $1,724,230. When these several items are added to the value of the inventory alone, the total is $9,880,987.

In addition, plaintiff incurred a $1,625,263 cyclamate-related loss with respect to retail claims. Plaintiff has not established that it was required, by contract or otherwise, to repurchase stocks of its products in the hands of its retailers. (Plaintiff stresses, however, that there was a business necessity in fostering goodwill.) Thus, there was no legal necessity for plaintiff to incur this expense.

Nonetheless, if such repurchases had not been made, it is possible that the retailers would have joined with CCG (or would have proceeded independently) in seeking to recover, from the Government, the value of this inventory. So long as the claim reflects injury resulting from inventory accumulated by reason of the Government's publicity, the injured party would be entitled to recover for the reasons set forth in this Opinion. Here, plaintiff has merely substituted itself for its retailers and has pursued relief singly rather than with multiple parties.

Thus the amount of $1,625,263 for retail claims is also recoverable, for a total on the items discussed to this point of $11,506,250.

■ Since recovery of retail claims has been allowed, the brokerage claims are not allowable because, as both parties agreed, that would constitute duplicate recovery.

In addition, CCG incurred expenses for G & A (general and administrative expense) of $804,832 which, for reasons discussed in the findings is reduced to $740,958. Together with the items discussed above, the total is $12,247,208.

Accordingly, the damages related directly to inventory which was accumulated as a result of activity surrounding cyclamates is 57 percent of $12,247,108 or $6,980,909.

■ Plaintiff incurred significant legal and auditing fees of approximately $216,609 in connection with its attempt to become versed in and to comply with the FDA regulations and with an industry-wide attempt to obtain relief in Congress (such as, for example, the possibility of statutory indemnification similar to that which was later enacted in the Federal Insecticide, Fungicide and Rodenticide Act, FIFRA, 7 U.S.C. § 136m). The indemnification effort failed.

The Government contends that recovery of these expenses is inappropriate. It is concluded that the legal fees incurred in connection with the unsuccessful industry-wide indemnification effort are not recoverable inasmuch as they are unrelated to the passage of and prosecution in the present Congressional Reference. Fees incurred in complying with the FDA regulations—which were substantively correct if somewhat procedurally defective—are likewise not recoverable.

In addition to the $216,609 noted above, plaintiff incurred legal fees of $30,000 (for a total of $246,609 in legal fees) in connection with settlement of a cyclamate-related claim against plaintiff by one of its suppliers which the Government does not contest. It is concluded that this amount is recoverable.

Likewise the Government agrees that $12,000 in fees incurred in connection with audit proceedings is recoverable, and it is so concluded.

the amount of inventory (57 percent) which was accumulated by reason of the activity surrounding cyclamates and the amount of inventory which accumulated for other reasons, *i.e.* routine business shortfalls between June 1, 1969 and August 31, 1970, and any prematurity of the recall which plaintiff could have attempted to prevent.

Legal and auditing fees are not related to the accumulation of inventory. Rather they are solely tied to the cyclamate-related issues and relate thereto in their entirety. Therefore, the 57 percent inventory adjustment factor is not appropriate here.

The total amount of recovery which is recommended is therefore increased from $6,980,909 by $30,000 and $12,000 for a total of $7,022,909.

Plaintiff's advertising expenses are the subject of detailed findings. Suffice it here to say that these expenses were not excessive, that is, they did not increase appreciably as a result of the cyclamate developments. Plaintiff's claim that it lost the future benefit of such advertising that it did engage in, is too speculative and hypothetical to be acknowledged. Moreover, any such future benefit is too inextricably entwined with present benefit as to be extrapolated. Plaintiff's attempt to arrive at a figure may be, as it contends, conservative but is nonetheless too speculative to be adopted here. Thus, the advertising expenses claimed are not recoverable.

With respect to mitigation, it is concluded that the plaintiff's reduction of its disposal sale price to Kiegel was not necessary and thus the actual amount of mitigation of $701,000 should be increased by $400,000 to $1,101,000. The Kiegel sale, however, was for plaintiff's entire accumulated inventory and thus, as with plaintiff's damages, only 57 percent of this revenue should be used as an offset from plaintiff's gross damages computed above. The amount received in mitigation is therefore $627,570.

Subtracting this mitigation adjustment of $627,570 from the previously computed recommended recovery of $7,022,909 results in a net loss for which recovery will be recommended of $6,395,339.

With respect to plaintiff's foreign sales, it is concluded that the cyclamate publicity was world-wide and therefore there should be no diminution from the computed accu-mulated inventory figure used above because of possible foreign sales.[31]

Finally, the evidence of record here does not support a finding that plaintiff engaged to purchase 187,000 cases of product even after the October 1969 announcements and thus the accumulated inventory figure used above need not be further reduced on this account.

The amount of recovery computed based on the foregoing is $6,395,339. It remains now to consider plaintiff's additional claim for damages relating to loss of working capital or for interest payments on outstanding loan balances which plaintiff was unable to pay by reason of its cyclamate loss.

The question of interest or compensation for the loss of working capital has been addressed extensively by the parties and is the subject of detailed Findings of Fact herein. It is necessary here only to summarize these findings and conclusions.

The plaintiff has established a general pattern of borrowing, whereby each year short-term loans are taken out, many of which are then renegotiated (or rolled over) from year to year. When possible or advisable, plaintiff then repays some of the loan balances. There was no evidence that plaintiff was ever less-than-current with its interest payments (thereby incurring any interest-on-interest).

This borrowed money was then used in the preparation of a year's inventory, with its repayment presumed upon receipt of sales revenues.

In its books of account, the cyclamate-related losses were reported as an extraordinary loss on the operations statement ($12,-987,442 in FY 1971 when the recall was effective) and a like amount was charged as a loss to members' equity thereby reducing working capital.

In reality, the damage sought by plaintiff under the heading of "loss of use of

---

31. Contemporaneous with the October 1969 announcements, FDA officials met with representatives from nationwide and international com-panies and with representatives from Germany, Britain, Austria, and Canada.

capital" is the interest incurred with respect to FY 1970 borrowings for which repayment was not possible due to the sharp cyclamate-related decline in sales revenue.

This borrowing was dispersed throughout the cooperative, with no breakdown as to its specific product uses. In short, there is no evidence in the record as to what portion, if any, of this borrowing was attributable to the Diet Delight line of products here in issue. It is known only that this line constituted about 14 percent of plaintiff's total sales revenues. There is no specific evidence that the loans taken by the cooperative were apportioned to products by percentage of sales or of cost of goods sold or indeed in any systematic manner.

■ Because of the inability to trace the borrowings to the specific account of plaintiff's cyclamate products, no recommendation for recovery of this damage is justified.

However, for the benefit of the Review Panel and of Congress, it should also be noted that, if recovery were to be awarded, the amount would be significantly less than has been computed by plaintiff.

As is explained in detail in the findings, net outstanding loan balances attributable to Diet Delight through FYE May 31, 1970 would be $6 million (based on Diet Delights' share of total sales revenues). Since only about 57 percent of the sales shortfalls of that product during the time in issue has been found to be cyclamate-related, only about $3,420,000 of the outstanding loan balance attributable to the product could be considered cyclamate-related.[32]

In FY 1976, plaintiff distributed some $4 million to its members from retained earnings. While this was a discretionary decision perhaps well-reasoned from a business point of view and in all fairness to the members, there is no reason why such retained earnings should not serve to offset the amount of losses now being charged in an equitable claim founded on moral obligation of the Government to the outstanding loan balances.

Thus, if interest were allowed on any of this amount, it would be computed on $3,420,000 from FY 1970 to FY 1976.

This would result in a computation of $1,809,740 as opposed to the some $17 million computed by plaintiff at the time of trial (and presumably increasing daily since that time).

While not recommended herein, it is noted that the additional recovery of the $1,809,740 in interest would increase plaintiff's total recovery (when added to the $6,395,339 computed taking into account mitigation) of $8,205,079.

In addition to addressing the cyclamate-related losses, the Congressional Reference here contains a provision that, if recovery is appropriated, no more than 15 percent of such funds shall be used for legal services. In that connection, for the convenience of Congress, the following facts connected with the fees incurred in conjunction with the instant proceedings are offered.

In 1977, plaintiff initiated its own individual effort, in Congress, to obtain relief—and the instant Congressional Reference resulted. In that connection plaintiff incurred legal expense (undoubtedly enhanced somewhat by the work product of the previous unsuccessful indemnification effort) of some $4,578.

Moreover, in the prosecution of this action, plaintiff noted some $13,450 in legal

---

**32.** Some of this amount was most likely paid as part of the repayments of FY 1972 to 1974. This repayment has been extrapolated based on Diet Delight's share of sales, and about $2,400,-000 could be attributed to repayments of borrowing for that product line. The outstanding balance would then, after FY 1974, be reduced to $3,600,000 for the Diet Delight product line.

If this were further reduced by an inventory adjustment factor of 57 percent, the outstanding loan balances after FY 1974 attributable to cyclamate-related losses would be approximately $2,142,000.

fees computed as part of a pre-trial submission.[33]

The total legal fees incurred in connection with the bringing of the instant action, then, have been computed, so far, as $18,028. It is anticipated that these fees would not be added to any recovery for cyclamate losses but would be compensated out of any total recovery as contemplated in the Congressional Reference.

## CONCLUSION

The total amount of recovery which is recommended herein is $6,395,339 (or, if the Review Panel or Congress include an amount for interest actually paid of $1,809,704, a total of $8,205,079).

## APPENDIX A

### Discussion of Congressional Reference
### DEFINITION OF A CLAIM

Congress has asked for a report setting forth all facts relevant to a determination as to whether the plaintiff has a legal or an equitable claim, or whether its claim is for a gratuity. *See* 28 U.S.C. § 2509 (1982). In order to determine the types of claims present here, it is first necessary to set forth their basic definitions.

#### *Legal Claims*

At the outset, it is necessary to determine the extent to which plaintiff has, or had, a "legal claim" against the Government. A claim may be considered to be within the definition of a legal claim when the plaintiff has, or had, a claim redressable in a court of laws. For ease of reference, legal claims may be further defined as follows.

A legal claim may be said to be "extant" where the plaintiff continues to possess a claim against the United States which is redressable in a court of law. Recovery on a legal claim is, of course, subject to a favorable determination on the merits.

Wholly apart from the merits, however, recovery may depend upon overcoming technical bars or impediments such as the statute of limitations, laches, failure to exhaust administrative remedies, or similar bars, such as a release of claims. Plaintiff may prevail on a legal claim where it can establish that its claim "survives" these defenses for reasons at law, such as a tolling of the statute of limitations; absence of prejudice concerning laches; absence of a meaningful administrative remedy; or duress or mutual mistake in the execution of a release. Where the claim does not survive the interposition of such bars, it may be said to be defeated or "extinguished."

In some situations, a claim would be cognizable as a legal claim against a private party but is not so recognized when asserted against the Government, principally by virtue of the doctrine of sovereign immunity. In short, the doctrine of sovereign immunity precludes the consideration of the claim against the Government. Such claims may be referred to as "foreclosed".

In appropriate situations and under the appropriate reference from Congress, the circumstances giving rise to extinguished or foreclosed legal claims may be examined in the context of an "equitable claim".

#### *Equitable Claims*

If it is determined that the plaintiff no longer has an extant legal claim, the court may address the question of whether plaintiff has an equitable claim.

Generally, equitable claims are defined as claims in which, in equity, justice and fairness, relief should be recommended. The term "equity" in this context is used in the sense of broad moral responsibility, and is not limited strictly to the juridical definition of that term used in formal proceedings in courts of equity. *See, e.g., Burk-*

---

**33.** Taking into account the extensive effort of counsel for both parties in pretrial, trial and post-trial proceedings, it is anticipated that this figure of $13,450 would represent only some part of the initial effort in prosecuting this case, such as reviewing the prior actions in Congress and preparing the complaint here.

*hardt v. United States*, 113 Ct.Cl. 658, 84 F.Supp. 553 (1949).

Consideration of equitable claims requires the Hearing Officer to address three main questions. *First:* Would plaintiff's claim be cognizable against the Government but for the interposition of a technical bar? If so, the court may examine the circumstances and determine whether equity requires the bar to be disregarded and the claim considered on its merits. *Second:* Would plaintiff's claim be cognizable against the Government but for the protection of sovereign immunity? Put another way, would the claim lie against the Government if it were treated as a private party? If so, the court may examine the totality of the circumstances and determine whether such immunity should be disregarded, and the claim considered on its merits as if having arisen against a private party.[1] *Third:* If plaintiff's claim is not otherwise cognizable, is it founded in justice and fairness based on a moral obligation of the Government?

In considering whether to give force to or disregard the obstacles noted above, and in assessing the moral obligations of the Government, certain general matters of policy may be addressed. Relief may be dependent not only on the merits of the particular circumstances but also on considerations of broad policy. Two examples are noteworthy.

First is the situation in which Congress has already anticipated and addressed the type of circumstances giving rise to the claim which is the subject of the reference. Where, for example, Congress has provided for a remedy at law for the situation giving rise to a Congressional Reference equitable claim (thus "pre-empting the field"), this remedy may be viewed as adequately addressing the matter, and no further relief may be forthcoming.[2]

The second situation concerns whether, as a matter of policy, the individual claimant in the reference should receive a unique form of relief through a private bill. In this regard, deliberations may include consideration of the plight of others similarly situated as well as general policy reasons for not subjecting the Government to widespread liability for relief not otherwise generally afforded.[3]

### Extinguished Legal Claims

This type of equitable claim includes the situation wherein the claimant at one time had a legal claim against the Government (sovereign immunity having been waived or otherwise inapplicable), and would have it now but for a technical bar or similar impediment. For purposes of this discussion, such technical bars or impediments include those defenses which exist at law and

---

1. In the instant case, our consideration must extend to the merits of the claim apart from any consideration of the bar of sovereign immunity. In its reference to the Chief Judge, Congress specifically requires that the Hearing Officer proceed, as provided by 28 U.S.C. § 2509, notwithstanding any bar of sovereign immunity as well as the bars of limitations and laches.

2. *See, e.g., Phillips v. United States*, 207 Ct.Cl. 924 (1975) (in which Congress had already provided a remedy at law to the extent that it deemed workmen's compensation to be appropriate); *Stewart v. United States*, 227 Ct.Cl. 511 (1981); and *Pomaski v. United States*, 230 Ct.Cl. 713 (1981) (involving statutory provisions for compensation for persons in military service). *See also Blabon v. United States*, 146 Ct.Cl. 13, 22, 173 F.Supp. 799 (1959) (wherein it was determined that the Government's obligation, if any, was fully discharged by virtue of treaty terms which it had negotiated).

3. *See, e.g., Burkhardt v. United States*, 113 Ct.Cl. 658, 84 F.Supp. 553 (1949) (wherein it was noted that the actions complained of would undoubtedly affect many other individuals); *Armiger v. United States*, 168 Ct.Cl. 379, 384–85 & n. 3, 339 F.2d 625 (1964) (discussing potential Government tort liability in connection with discretionary functions); *Feffer & Sons v. United States*, 166 Ct.Cl. 506 (1964); *O'Donnell v. United States*, 166 Ct.Cl. 107, 119 (1964) (Whitaker, J., concurring); and *Innocent Victims of Wounded Knee v. United States*, 229 Ct.Cl. 465 (1981) (compensation to crime victims not extended to property loss). *See also Mizokami v. United States*, 188 Ct.Cl. 736, 414 F.2d 1375 (1969) (involving a special jurisdictional statute recognizing a claim at law which would otherwise be foreclosed against the Government).

which, if raised, would be resolved in defendant's favor prior to any consideration of the merits of plaintiff's claim.

The types of technical bars include: (1) the statute of limtations [4]; (2) the doctrine of laches [5]; and (3) the failure to exhaust established legal remedies, including those which are available administratively.[6] 28 U.S.C. § 2509(c)(1982) requires that the Hearing Officer determine all such facts which may bear on these specific issues. Other impediments which may warrant consideration by the Hearing Officer, if appropriate under the circumstances of each case, include the presence of a release and the doctrine of *res judicata.*[7]

When it is deemed appropriate to disregard the technical bars or similar impediments, the merits of the claim are then considered under the law applicable to the general subject matter of the claim.[8] This consideration includes examination of any defenses customarily raised in the given subject area unless Congress instructs otherwise.[9]

### Foreclosed Legal Claims

Legal claims against the Government are frequently foreclosed by the doctrine of sovereign immunity (or by a similar doctrine of governmental privilege) under circumstances where a private party would be subject to liability. The circumstances giving rise to such claim may nonetheless be examined on the merits in the context of a Congressional Reference equitable claim.[10] Again, it is important to keep in mind the general policy considerations set forth at the outset of the discussion of equitable claims.

In determining whether to recommend relief in such an equitable claim, the main factor to be considered is whether the Government, if standing in the shoes of a private party, would have been subject to suit and found liable. *See, e.g., Burt v. United States,* 199 Ct.Cl. 897, 906–07 (1972). The principles to be applied are those which govern the subject area of the law generally bearing on the claim. *See, e.g., Armiger v. United States,* 168 Ct.Cl. 379, 384, 339 F.2d 625 (1964); *Kochendorfer v. United States,* 193 Ct.Cl. 1045, 1056 (1970). As a general rule, the claimant must establish: (1) the presence of an unjustified act or omission, or other wrongful conduct by the Government; and (2) the presence of an injury resulting from such act or omission. *See, e.g., B Amusement Co. v. United States,* 148 Ct.Cl. 337, 342, 180 F.Supp. 386 (1960).

Examples of this type of equitable claim are legion. Perhaps the best illustrations of the elements of such claims are found in the tort area. They involve actions by the Government allegedly constituting negligence, but in which the Government might well be protected by the preservation of

---

4. *See, e.g., Group v. United States,* 165 Ct.Cl. 612 (1964) (involving a civilian employee's claim for back pay and the statute of limitations bar); *Clark v. United States,* 167 Ct.Cl. 197 (1964) (involving a contract suit for transportation service rates); *Gondrand v. United States,* 166 Ct.Cl. 473 (1964); and *Ghitescu v. United States,* 201 Ct.Cl. 823 (1975) (involving the status of enemy-alien property appropriated by the United States).

5. *See, e.g., Ghitescu v. United States, supra* 201 Ct.Cl. 823 (1975).

6. *See, e.g., Adams v. United States,* 175 Ct.Cl. 288, 358 F.2d 986 (1966) (involving the Government's rejection of a product furnished by plaintiff under a contract).

7. *See, e.g., Adler v. United States,* 191 Ct.Cl. 607, 615, 423 F.2d 1362 (1970), 199 Ct.Cl. 809 (1972); *Rumley v. United States,* 169 Ct.Cl. 100 (1964)

(involving *res judicata* ), and *Harvey-Whipple Inc. v. United States,* 169 Ct.Cl. 689, 700, 342 F.2d 48 (1965) (involving a release).

8. *See, e.g., O'Brien Dieselectric Corp. v. United States,* 207 Ct.Cl. 903, 923 (1975) (with respect to contract delays).

9. *See, e.g., Lance Industries, Inc. v. United States,* 3 Cl.Ct. 762, 776–78 (1983) (discussing merits defenses).

10. A finding of liability against the Government as if it were a private party may also be subject to technical bars or impediments. In that event, the bars or impediments are subject to the same considerations outlined in the immediately preceding subsection.

sovereign immunity under the terms of the Federal Tort Claims Act. *See, e.g.,* 28 U.S.C. § 2680(h) (1982).

In *Wong v. United States,* 220 Ct.Cl. 750 (1979), the alleged negligence of the defendant involved injuries sustained as a result of the medical care offered by a Government-operated facility to a dependent of a serviceman. It was determined that the Government could be found liable only in the same manner as would any private medical facility. It was ultimately determined that negligence or fault was absent and hence that no recovery could be recommended on the basis of an equitable claim.

Similarly, where it was alleged that the Government had negligently constructed certain flood-control devices, resulting in flooding of plaintiff's land, it was held that no relief should be recommended in an equitable claim since it was found that the Government was not at fault and had committed no negligence or wrongdoing in connection with its construction. *B Amusement Co. v. United States,* 148 Ct.Cl. 337, 180 F.Supp. 386 (1960); *Cf. Armiger v. United States, supra,* (negligent failure to provide appropriate pre-flight insurance materials). *See also Feffer & Sons v. United States,* 166 Ct.Cl. 506 (1964) (recovery denied where alleged negligent misrepresentation was not justifiably relied upon and was not the cause of the damage).

In short, the type of equitable claim described above involves a situation where, but for sovereign immunity, a claim would lie against the United States in the same manner as it would against a private party. The subject area of the law is reviewed and, where some fault, negligence, breach of contract, or other unjustified act or omission is required in order to find liability between two private parties, that same requirement obtains in determining whether an equitable claim lies against the United States (assuming sovereign immunity to be properly disregarded). Claims of negligence are among the most prevalent in the Congressional Reference arena. It is perhaps for this reason that the presence of fault or negligence is held to be a requirement in the majority of Congressional Reference cases.

Because it is clearly akin to sovereign immunity, we must also examine a concept referred to as "governmental privilege". The Government is not only protected from suit by the doctrine of sovereign immunity but is also shielded from liability by unique absolute or qualified governmental privileges. As with the type of equitable claim discussed above, the Government may be placed in the position of a private party by disregarding these privileges or superior rights. The Government may not have acted or failed to act in an "unjustified" manner, and may not have acted wrongfully given the privileges and rights inherent in the sovereign; nonetheless, had a private party acted as did the Government, it would have been subject to liability. The principal concern is not necessarily whether the Government itself acted wrongfully, but whether a private party would have been liable had it acted as did the Government but without the Government's privileges.

For example, in *Burkhardt v. United States,* 113 Ct.Cl. 658, 84 F.Supp. 553 (1949) the Government constructed a dam to improve commerce and navigation. The resulting rise in the water level interfered with the operation of plaintiff's power plant. The Government's taking was "privileged" inasmuch as it had paramount rights under the Constitution to improve commerce and navigation. Given this superior right, there would be no basis for a claim even if sovereign immunity were to be waived. Had the action been taken by a private party lacking the Government's superior rights (or a dominant easement), it would have incurred liability. In short, the Government action could not be called "unjustified." Nonetheless, the court considered that situation to fall within the meaning of an equitable claim as used in the context of a Congressional Reference. *See also North Counties Hydro-Electric Co. v. United States,* 170 Ct.Cl. 241, 249 (1965).

A parallel situation was presented in *Town of Kure Beach v. United States*, 168 Ct.Cl. 597 (1964). There the Government exercised its right under the Fifth Amendment of the Constitution to take certain property to establish a safety zone around an ammunition terminal. Because its fiscal structure was diminished, the municipality was unable to meet certain obligations. Though the Government's actions were not wrongful, at least in a legal sense, the court found that this did not preclude the satisfaction by Congress of an equitable claim. Recovery was recommended in recognition of the rights plaintiff would have had under similar circumstances against a private citizen or body corporate for frustration of a contract.

Finally, a clear illustration of the type of equitable claim discussed here can be found in *Sperling & Schwartz, Inc. v. United States*, Cong.Ref. No. 174, November 21, 1977 (COLAIANNI, T.C.), *adopted*, 218 Ct.Cl. 625 (1978). In that case, the Government publicized certain statements concerning the safety and lead content of plaintiff's dinnerware. Plaintiff argued that in so doing the Government had committed libel. Actions at law against the Government for libel are precluded by virtue of the Government's preservation of its sovereign immunity in the Federal Tort Claims Act. 28 U.S.C. § 2680(h). Such immunity can be disregarded in the context of a Congressional Reference equitable claim. Akin to-this immunity is the additional and absolute privilege which attaches to the Government, as sovereign, with regard to statements made by its employees in their official capacity. However, as the trial commissioner pointed out:

[T]he doctrine of [privilege as announced in] *Barr v. Matteo*, 360 U.S. 564 [79 S.Ct. 1335, 3 L.Ed.2d 1434] (1959), is inapposite to a Congressional reference case, in which Congress is asking the Chief Trial Commissioner to determine whether the plaintiff has an 'equitable claim' against the United States. If plaintiff would have a legal claim against the United States, but for the existence of some governmental privilege, he has an equitable claim within the meaning of *Burkhardt* [cite omitted] and *Burt* [cite omitted]. [Slip op. at 13–14.]

In a few cases involving superior Government rights, the injury may not result from any Government act or omission whatever, but from some other action by which the Government benefits. Notwithstanding the absence of Government action (or failure to act), an equitable claim may be found to exist where recovery would lie against a private party.

For example, in *Bechtel v. United States*, 198 Ct.Cl. 929, 947–49 (1972), the Government acquired legal title to certain lands as a result of the accretion and/or avulsion of a river (as distinguished from title accruing by virtue of a taking of land by the Government). Notwithstanding this title, the property continued to be occupied by the private parties who held initial patent to the land. The Government's title (unlike that of a private party) was not subject to state adverse possession law; rather the Government rights were paramount. Had the Government been shorn of these paramount rights, title would have vested in plaintiff under the state law of adverse possession. It was found that plaintiff had an equitable claim inasmuch as it would have prevailed over a private party in a legal action.

Thus, in some circumstances, the test may be only whether a private party, acting as had the Government, would be liable; it need not be necessary to a recommendation for relief that the Government be found to itself have acted unjustifiedly or wrongfully.

### Claims Not Otherwise Cognizable But Founded on Moral Obligation

The foregoing discussion focused on equitable claims of two types: (1) claims which could have been brought against the Government but are now extinguished by a technical bar such as laches or limitations; and (2) claims which could have been brought against a private party but are foreclosed against the Government, such as

those foreclosed by the doctrine of sovereign immunity.

There is yet another, third, type of equitable claim. With this type of claim there may be no parallel at all to suit against a private party. The Government may be at fault in a circumstance in which no liability would attach even against a private party. Nonetheless, as an equitable claim, recovery might be recommended in certain appropriate circumstances.

Additionally, and more commonly, this third type of equitable claim may concern a situation in which no Government fault is involved but where there is some other relationship between the claimant and the Government. Such situations include the following (although the relationship may not always be explicitly acknowledged in the caselaw of individual situations):

1. Where the Government (or the public whom it represents) derived some benefit from the act (or omission) involved, to the detriment of the particular plaintiff; or

2. Where the actions in issue were undertaken in furtherance of a "public purpose".

Where relief cannot be recommended under either of the two preceding classifications of equitable claims, relief may be recommended based on broad principles of equity and fairness; in short, where the Government owes a moral obligation to the plaintiff. *See Burt v. United States*, 199 Ct.Cl. 897, 917 (1972) (Harkins, Commissioner, *concurring*.)

It must be noted, however, that since there would likely be no claims at law (either against the Government or a private party) for claims such as these, there is no parallel legal framework upon which to evaluate their merits. Each case must be examined on an ad-hoc basis and a determination reached as to whether, on the particular facts presented in the individual case, recovery should be recommended.

We turn first to the question of benefit derived by the Government. In *Gay Street Corp. v. United States*, 130 Ct.Cl. 341, 127

F.Supp. 585 (1955), the United States had entered into a long-term lease, contrary to applicable law. The Government had vacated the premises after one year and was legally liable for only one year's rent. The court found no equitable claim beyond the first year of the lease. However, with respect to improvements made in anticipation of multi-year occupancy, the claimant was found to have an equitable claim. While there was no finding of any Government wrongdoing such as would render a private party liable, the court recommended that relief be granted and stated:

> While this is not a claim [at law] upon which this court could render judgment, we believe the plaintiff is morally entitled to this amount. The Government reaped the benefit of the expenditure and in good conscience ought to place the plaintiff in approximately the same position as it was prior to the execution of the lease. *Id.* at 350.

The benefit derived by the Government was the bellwether in the court's resolution of this aspect of the case. Where such benefit has accrued to the Government at the expense of the plaintiff, relief is a matter of equity and moral conscience, in no way constituting a gratuity.

The court might also consider whether the activities which gave rise to the claim were undertaken for a "public purpose" or in connection with programs in which the Government has an "intrinsic interest". In *Kochendorfer v. United States*, 193 Ct.Cl. 1045 (1970), an accident involving the State National Guard occurred. The airplanes involved were the property of the Government; the pilots' salaries were paid by the Government; and the accident was caused in part by the negligence of one of these pilots. Although the court attributed no negligence to the Government, it did find the presence of an equitable claim on the basis of a recognition of a moral obligation. The court specifically noted that:

> [T]he interest of the United States is served by the existence of [these] trained reserve forces. Even though the technical responsibility for training those

forces is left to the States, the defendant is deeply concerned therewith. *Id.* at 1056.

Similar results are found where an activity performed under private auspices is of such a nature that, were it not provided, the Government might well undertake the activity directly. *See Froman v. United States,* 157 Ct.Cl. 661 (1962) (USO activities which, if not performed privately, might be undertaken by the Government in view of the benefit derived by the military); *Columbia Hospital v. United States,* 125 Ct.Cl. 712, 718, 113 F.Supp. 691 (1953) (wherein the court noted that cessation of its hospital care to an individual wounded in the course of federal criminal investigation might result in the Government directly undertaking to provide such service).

This review does not include all situations in which the Government's moral responsibility or obligation may come into play. Suffice it to say that this category of equitable claim is properly recognized so as to afford relief in those unique situations where justice and fairness so demand. *See Southwest Metro Water District v. United States,* 194 Ct.Cl. 994 (1971) (equitable claim found where Government took certain lands within the plaintiff's planned industrial park, resulting in damages not cognizable in law); and *Rumley v. United States,* 169 Ct.Cl. 100 (1964) (equitable claim found despite Government's proper termination of plaintiff's contract, resulting in a judgment against plaintiff for excess reprocurement costs).

### Gratuities

A gratuity may be found to exist in a variety of situations. A gratuity may exist where: (1) the Government has not acted unjustifiedly (or has not acted at all), and where, if a private party, the Government would not be liable; or (2) the Government derived no benefit from and had no intrinsic interest in the action which gave rise to the claim. In short, a gratuity may be found where the claimant has neither a legal nor an equitable claim as defined above.

Where the relief is found to constitute a gratuity, the court may so note to Congress, leaving to that body the determination as to whether relief should nonetheless be granted. *See, e.g., Gay Street v. United States,* 130 Ct.Cl. 341, 127 F.Supp. 585 (1955), with respect to the rents due under a lease (which was entered into contrary to applicable law) after the Government vacated the premises.

### CONCLUSION

The foregoing discussion is by no means exhaustive of all pertinent Congressional Reference cases, nor do all cases fit neatly into the illustrative situations noted above. Each case must, of necessity, be determined on its own merit by the individual Hearing Officer and the designated Review Panel.

The summary above may provide some insight into the standards and definitions which this Hearing Officer believes are relevant and appropriate to the instant case and which are necessary for purposes of this opinion. It is sufficient that the terms are adequately defined so as to enable Congress to determine whether, in its view and given its ultimate responsibility and authority in this matter, the relief it proposes should be forthcoming.

The other portions of this Report set forth the complex facts involved in the instant case, and analyze the many and varied claims presented on the basis of those facts. Considering each of the types of case described above, a determination is made as to whether, under the factual circumstances and consistent with the terms of the specific reference herein, plaintiff has a legal or an equitable claim, or a claim for a gratuity, as defined above.

One additional comment is appropriate. In the context of this case, the definitions of the various types of claims set forth above may be sufficiently clear, without more, with respect to considerations of whether plaintiff (1) has any extant legal claims; or (2) had any legal claims extinguished by such bars as the statute of

limitations or laches or similar impediment; or (3) would have had any claims cognizable against a private party but foreclosed against the Government by virtue of its sovereign immunity or similar Government privilege. However, consideration of whether plaintiff's claims are equitable in nature since founded on moral obligation or constitute a claim for a gratuity may not be so self-evident and further discussion may be helpful here.

The public, through their elected officials, has established the Food and Drug Administration (FDA) and vested it with the duty, responsibility, obligation, and authority to regulate the introduction of various food and drug products into interstate commerce and the marketplace. It is clear that the public is the greatest and ultimate beneficiary of this regulation, particularly insofar as the protection of the public health is concerned. In short, the FDA performs a public service and the public derives a clear benefit from the activities of the FDA generally.

In some instances, the denial of access (or continued access) to the marketplace may result from the reasonable conduct of appropriate scientific testing and evaluation, including continual testing using improved technology and scientific data bases.[11] In other cases, such access may be denied by virtue of tests which were not of scientific probity or significance, or which were conducted or evaluated without reasonable and due care.

In either event, where damage is sustained by marketers as the result of the regulatory process, and particularly where changing scientific data and the state of the art may be of critical significance, the first question of paramount importance is: should the burden be borne solely by the individual manufacturers and/or marketers, or should it be shared by the public which benefits from the continual evaluation by the FDA of the safety of various foods and drugs, by allowing resort to the national treasury as a source of compensation?

The essential criterion here may be a consideration of whether the Government *should be obligated*, on moral considerations, to bear the burden for compensation.[12] If it is determined that no such obligation exists, the claim may be defined as one for a gratuity and no recommendation made for relief in this Congressional Reference.

If it is determined that such an obligation exists, then the claim is one in equity, founded on moral consideration. The key to any such determinations are the facts of a particular case, and the degree to which it is determined that the Government bears a moral responsibility to compensate plaintiff for the damages it incurred. Under appropriate factual circumstances, therefore, it may be found that the claims are stated in equity, based on moral considerations, and that the relief suggested by Congress should be recommended.

---

**11.** It should be noted in the instant case that the use of cyclamates as a food additive had been recognized by FDA as appropriate for some time prior to the events in issue, and plaintiff's marketing practices conformed with this approval. As new scientific data came to light and the state of the art changed, however, the status of cyclamates was re-examined. These are the changes with which this case is chiefly concerned. It cannot be said, however, that the plaintiff was in any way acting in an improper or non-approved manner in its marketing practices.

**12.** As noted in the preceding discussion, the presence of Government fault or wrongdoing is not essential to classify a claim as an equitable claim, founded in moral obligation, if the Government, or the public it represents, derives a benefit from or has an intrinsic interest in the events giving rise to the claim. Nor is it a necessary element of such a claim that a private party would be liable if standing in the place of the Government. Nonetheless, the totality of the factual setting should be evaluated to determine whether the Government has a true moral obligation to compensate claimants.

### APPENDIX B

Statutory Provisions and
Related Case Law

## I. *Food, Drug, and Cosmetic Act*[1]

Given the large number of statutory provisions pertinent to this case, it is helpful at the outset to describe the general framework of the various acts and the relevant terms employed therein.

The Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301–392 (1982)[2] (FDCA), is the primary statute involved here. Many substances which are to be introduced into interstate commerce are addressed, and the Secretary of the Department of Health, Education and Welfare (HEW) (now the Department of Health and Human Services) and the Food and Drug Administration (FDA) are given responsibility and authority for carrying out the statutory provisions. The term "agency" as used hereinafter refers to the FDA unless otherwise noted.

Foods, food additives, drugs and new drugs are among the substances treated by the statute. These will be discussed below under appropriate subheadings. At the outset, however, it is helpful to review the overall scheme of the statute and the various types of actions contemplated therein.

### A. *Regulation and Enforcement*

The FDCA defines the types of substances which are to be administered under the act and regulated by the FDA. With respect to such substances, a number of actions are possible.

In some circumstances the FDCA itself provides full instructions and procedures for the actions to be taken by the agency in its regulatory role, including seizure of offending products. The agency may enforce the statutory provisions without first issuing governing regulations.

Actions where the agency has not issued an industry-wide regulation are generally directed against a specific offending product rather than a general class of substances. See 21 U.S.C. §§ 334, 355 (adulterated or misbranded products); 21 U.S.C. § 342 (adulterated foods); and 21 U.S.C. § 348(a) (food additives).

Absent agency regulation, the court may be called upon to render *de novo* determinations as to whether the substance is one over which the agency has jurisdiction. *See Durovic v. Richardson,* 479 F.2d 242 (7th Cir.), *cert. denied,* 414 U.S. 944, 94 S.Ct. 232, 38 L.Ed.2d 168 (1973) and *Tyler Pharmacal Distributors v. HEW,* 408 F.2d 95 (7th Cir.1969), in which enforcement actions were imminent.

Similarly, an action arose when "starch blockers" were introduced into the market without prior agency approval. The manufacturer believed them to fall within the statutory definition of foods (and therefore not subject to prior agency approval), whereas the agency believed them to be drugs subject to approval. The agency was able to assert its statutory right to regulate such products (including possible seizure of such products and removal from the market, pending agency approval) thus forcing the producer to seek a judicial determination as to the proper definition and classification of the substance. *See Nutrilab Inc. v. Schweiker,* 547 F.Supp. 880 (N.D.Ill.1982), *aff'd,* 713 F.2d 335 (7th Cir. 1983).

Even in such circumstances, where there has as yet been no issuance by the agency of regulations, the courts may await their issuance, or similar determinations by the agency, if such are contemplated. *See Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *Ciba Corp. v. Weinberger,* 412

---

**1.** Citations herein (particularly to the Food, Drug and Cosmetic Act), are to the United States Code rather than to the relevant act itself in view of the many amendments since its enactment.

Some of the cases cited herein were decided after the events in issue. Unless otherwise noted, these decisions involve the same statutory provisions as are here in issue and do not reverse any prior case law. They are construed as enunciating the law as it had existed at all times here in issue.

**2.** All citations are to the 1982 Code unless otherwise noted.

U.S. 640, 644, 93 S.Ct. 2495, 2498, 37 L.Ed.2d 230 (1973).

When enforcement actions or seizures provided in the FDCA have been initiated, the action is usually directed to the product itself in a libel or similar action. *See United States v. An Article of Drug ... "Furestrol",* 415 F.2d 390 (5th Cir.1969); *United States v. 41 Cases, more or less,* 420 F.2d 1126 (5th Cir.1970); *United States v. An Article of Drug ... "Bentex Ulcerine",* 469 F.2d 875 (5th Cir.1972), *cert. denied,* 412 U.S. 938, 93 S.Ct. 2772, 37 L.Ed.2d 397 (1973).

There are also circumstances in which the agency has issued preemptive regulations of industry-wide application. This situation was presented in *National Nutritional Foods Association v. Weinberger,* 512 F.2d 688 (2d Cir.), *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975), wherein the agency had determined that megadoses of certain vitamins were not merely nutritional supplements but were designed for use as drugs and, as such, were subject to agency regulation. A party adversely affected by such regulations may seek review under the procedures outlined in the FDCA itself, if any. If the FDCA does not address the matter, the party may seek review under the procedures set forth in the Administrative Procedure Act (APA) discussed below. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 151, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1961).

After the appropriate agency action (under the FDCA or APA), judicial action may be initiated. Judicial review in this instance is usually not de novo but rather a review of the agency action. As a general rule, where the agency action included an opportunity for interested parties to comment, the courts will look to see whether the action was within the agency's authority and whether it was arbitrary or capricious. Where the agency action is accompanied by an opportunity for a hearing, the courts will usually determine whether the action was supported by the substantial evidence of the assembled record. *See Ab-*

*bott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1961).

Where broad regulations are issued, a challenge directed to them, under either the FDCA or the APA and together with appropriate judicial review, is the first line of defense. Such challenge may raise questions of the agency's jurisdiction, compliance with applicable procedures, or substantive correctness.

Absent such initial challenge, the agency may enforce the regulations as may be appropriate, including the possible seizure of products and removal from the market. The enforcement action presents a second line of defense, namely that a producer may question whether indeed its marketing practice violates the terms of the regulation.

However, having failed in the first instance to challenge the validity of the regulation, an interested party may not be able to raise that issue in the second instance, that is in connection with an enforcement action. *See, e.g., Ciba Corp. v. Weinberger,* 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973), wherein the court stated that if there has been an administrative determination, whether implicit or explicit:

> the tactic of 'reserving' the threshold question (the jurisdictional issue) for later judicial determination [in connection with any enforcement actions such as seizure] is not tolerable. There is judicial review of the FDA's ruling. But petitioner, having an opportunity to litigate the 'new drug' issue before the FDA and to raise the issue on appeal to the court of appeals, may not relitigate the issue in another proceeding. *Id.* at 644, 93 S.Ct. at 2498.

*See also Abbott Laboratories v. Gardner,* 387 U.S. 136, 151, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1961).

Thus, in reviewing the proceedings with respect to any specific product or substance, it is important to determine whether the agency promulgated appropriate regulations and, if so, under what statutory authority, under what procedures, and subject to what avenues of challenge or review.

Accordingly, we turn to a review of the FDCA provisions concerning the agency's regulatory jurisdiction over various types of substances and to the issuance of regulations.

### B. *Foods*

The FDCA treats foods in a number of ways not relevant here. Of interest in this case are the statutory provisions which permit the Secretary to promulgate regulations in the interest of honesty and fair dealing, and in the interest of consumers. Such regulations fix and establish: (1) a reasonable definition and standard of identity for the food; (2) a reasonable standard of quality; and/or (3) reasonable standards of fill of container. *See* 21 U.S.C. § 341.

Foods which are adulterated or misbranded may be subject to seizure by the agency. 21 U.S.C. § 334. An "adulterated" food is defined in 21 U.S.C. § 342. A "misbranded" food is defined in 21 U.S.C. § 343; this definition includes foods which purport to be or are represented as intended for "special dietary uses", unless its label bears information concerning its vitamin, mineral, and other dietary properties which the Secretary determines to be necessary to fully inform purchasers as to its value for such uses. *See* 21 U.S.C. § 343(j).

The procedures required for the promulgation of a regulation for foods for "special dietary use" are stated in 21 U.S.C. § 371(e). These procedures provide that the regulation shall first be set forth in the form of a proposal (by the Secretary *sua sponte* or pursuant to a petition by any interested person), with an opportunity provided for all interested persons to offer comments. Upon receipt of comments, the Secretary shall issue a public order acting upon the proposal.

Thereafter, any person adversely affected may file objections. The filing of such objections stays the effectiveness of the objectionable provisions. In addition, a hearing may be requested and shall be held after appropriate notice. As soon as practicable after completion of the hearing, the Secretary shall issue a final order (not to take effect prior to the expiration of 90 days unless an emergency situation is present) which shall be based upon the "substantial evidence" of record. Judicial review of such final agency action is provided for in 21 U.S.C. § 371(f).

Pursuant to the authority to issue regulations concerning special dietary foods, the agency did in fact adopt regulations. 21 C.F.R. Part 125. These regulations included provisions regarding the labeling of products containing non-nutritive sweeteners, products which were primarily used by those such as the diabetic and obese who must restrict their intake of nutritive sugars. 21 C.F.R. § 125.7. Such labeling requirements applied to saccharin and cyclamates and are not essentially in dispute here.[3]

### C. *Food Additives and New Drugs: Definition and Classification*

The FDCA envisions the introduction of new products into the market, including those which are "food additives" or "drugs" (including "new drugs"). As discussed below, the statute defines those substances, including food additives and new drugs, which are subject to pre-marketing approval by the FDA.[4]

For our purposes, food additives are defined as substances which are added to a food substance and consumed as part of the final food product. *See* 21 U.S.C. § 321(s). Drugs are, for present purposes, defined as substances used in the diagnosis, treatment, mitigation, cure, or preven-

---

**3.** At all times here in issue, plaintiff's products conformed with the applicable labeling requirements. Additional labeling requirements applicable to the use of cyclamates as new drugs after October 1969 will be discussed elsewhere.

**4.** A substance which might otherwise meet the definition of "food additive", "drug", or "new

drug" is exempt from the regulatory jurisdiction of the agency if it is a substance which, either on the basis of scientific data or prior use experience, is "generally recognized as safe" (GRAS) within the community of qualified scientists. *See* 21 U.S.C. §§ 321(s) (food additives) and 321(p) (new drugs).

tion of disease. *See* 21 U.S.C. § 321(g)(1); *see also* 21 U.S.C. § 321(p) (new drugs).

The agency may issue regulations which classify a particular substance as a food additive or a new drug. This may be accomplished in a variety of ways, including action undertaken pursuant to the Secretary's general authority to promulgate regulations for the efficient administration of the statute. *See* 21 U.S.C. § 371(a). Some examples are of interest here.

In *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973), the FDA had withdrawn previously approved new drug applications for certain drugs, and had promulgated procedures for the classification of other "me-too" drugs which had not been the subject of prior administrative consideration. The manufacturers, whose market access may have been restricted, sought to obtain judicial determination of the status or classification of the substances (specifically that the substances were not "new drugs" by virtue of their GRAS status). The district court held that although it could determine whether the substances were "new drugs", this jurisdiction was concurrent with that of the FDA and that the agency should resolve the "new drug" issue in an administrative proceeding. The Supreme Court agreed with the district court, and held that just as the agency may withdraw prior approval of a drug application pursuant to 21 U.S.C. § 355(e) (subject to judicial review as provided in 21 U.S.C. § 355(h)), the agency may also issue regulations defining or classifying substances as new drugs as defined in 21 U.S.C. § 321(p).

Similarly, the agency's authority under 21 U.S.C. § 371(a) to classify or define certain uses of megadoses of vitamins as "new drugs" was upheld in *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688 (2d Cir.), *cert. denied* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). The court also held that the agency must first issue its proposal to classify a substance (*e.g.*, as being within its jurisdiction), then and allow for appropriate comment. Further, when promulgating the final regulation, the FDA must state the basis for its action with sufficient particularity to permit judicial review. The agency action is then subject to judicial review and will be sustained unless arbitrary, capricious, or contrary to law. (These aspects of the statute will be discussed in the subsection concerning the Administrative Procedure Act.)[5]

Regulations classifying substances as within the agency's jurisdiction must contain a statement of the reason for the action with sufficient specificity to enable judicial review, and the underlying data must be available for review. *See National Nutritional Foods, supra; see also Dow Chemical v. Consumer Product Safety Commission*, 459 F.Supp. 378 (W.D.La. 1978); *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240 (2d Cir.1977).

Through classification by general regulation, the agency can address the status of substances on a broad scale, and need not restrict assertion of its jurisdiction to individual enforcement suits. Regulations promulgated pursuant to 21 U.S.C. § 371(a) are self-operative and may be applicable on an industry-wide basis where as an enforcement action is brought against a particular product or manufacturer. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 147, 87 S.Ct. 136, 1514, 18 L.Ed.2d 681 (1967).

When the agency does issue such regulations, as for example under 21 U.S.C. § 371(a) where the FDCA does not provide for further administrative proceedings and does not specifically provide for any judicial review, such review is nonetheless ob-

---

5. The "arbitrary and capricious" standard to be applied upon judicial review does not, in our view, confer undue finality on the agency determination of classifications. Generally, such classifications merely define a substance as being within the FDA's jurisdiction; it is the promulgation of regulations prescribing the condi- tions of use which affects a product's marketability. A marketer may petition the agency for the issuance of such regulations under the procedures outlined in later subsections concerning petitions for food additives. The final regulations are then subject to the standards of review discussed therein.

tainable. In *Abbott Laboratories v. Gardner*, 387 U.S. at 151, 87 S.Ct. at 1516, the Supreme Court upheld the right of federal courts to review the promulgation of such regulations under the Administrative Procedure Act. The court noted that the agency had promulgated the regulation after notice and an opportunity for comment, and that the standard of review would be whether the agency regulation was arbitrary, capricious, or contrary to law (including exceeding the FDA's authority under the statute).

As discussed in later subsections, once it is determined that a substance falls within agency jurisdiction, the FDCA further provides a series of procedures for prescribing conditions of its use—either through petition of the marketer or *sua sponte* action by the agency.

Beyond the statutory procedures for obtaining agency approval of a substance within its jurisdiction, it is helpful to note certain substantive provisions. In order for a food additive to be used in the market, the agency must find that it is "safe" for its intended use. This safety requirement is further circumscribed by the Delaney Amendment, 21 U.S.C. § 348(c)(3), which states that no substance can be considered to be safe for use as a food additive if it has been found to have caused cancer when ingested by man or animal.

In order for a substance to be approved as a drug, it must not only be found to be "safe" but (at the times here in issue) also "efficacious" in the prevention, diagnosis, treatment, cure or mitigation of disease. 21 U.S.C. § 321(p). Despite the additional criterion of efficacy, the standard with respect to safety is somewhat more relaxed than with food additives inasmuch as the terms of the Delaney Amendment do not apply to drugs. In short, the possible carcinogenicity of a substance does not preclude its use as a drug when the cancer risk is balanced against the need for the

drug and its possible benefit in the treatment of disease.

We turn now to a detailed exposition of the regulatory processes by which food additives and new drugs are approved for use.

D. *Petitions for Food Additives; Applications for (New) Drugs*

When a manufacturer or marketer wishes to introduce into the market a substance which is recognized as a food additive, he may file a food additive petition with the agency. See 21 U.S.C. § 348(b)(1); *see also* similar provision for new drug application in 21 U.S.C. § 355(b).

Upon receipt of a food additive petition, the Secretary shall within 90 days (extendable to no more than 180 days), issue a regulation prescribing the conditions for the use of the substance, or deny the petition stating the reasons therefor. See 21 U.S.C. § 348(c)(1); 21 U.S.C. § 355(c) (similar provision concerning new drug applications).

Any party adversely affected by the Secretary's order with respect to food additives may file objections within 30 days of the publication of the order and may request a hearing. See 21 U.S.C. § 348(f)(1); 21 U.S.C. § 355(c)(2) (similar provision concerning request for hearing on new drug applications).

After requisite notice, a full evidentiary-type hearing is to be held on the matter of the food additive.[6] As soon as practicable thereafter, the Secretary is to issue a final decision based upon a fair evaluation of the complete record. See 21 U.S.C. § 348(f); 21 U.S.C. § 355(d) (similar provisions for new drug applications, although somewhat different time schedules may pertain).

An appeal from the final decision by the Secretary may be taken within 60 days after issuance of the final decision to an appropriate United States Court of Appeals. See 21 U.S.C. § 348(g); 21 U.S.C. § 355(h) (for similar provision with respect

6. When the initial petition or application is defective and insufficient, a subsequent hearing may be deferred. See *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973).

to new drugs). The FDCA provides that, with respect to food additives, "the findings of the Secretary with respect to questions of fact shall be sustained if based upon a fair evaluation of the entire record at such hearing" and that "the court, on such judicial review, shall not sustain the order of the Secretary if he failed to comply with [the requirement that his order be based on a fair evaluation of the entire record and include a statement setting forth in detail the findings and conclusions upon which the order was based.]" 21 U.S.C. § 348(g)(2) and (3); 21 U.S.C. § 355(h) (similar provision for new drugs embodying the "substantial evidence" standard). On appeal, leave may be granted under appropriate circumstances to introduce new evidence as to both food additives and new drugs.

### Food Additives and The Delaney Amendment

In connection with regulations prescribing the use of any food additive, an additional statutory provision warrants further mention. The FDCA, 21 U.S.C. § 348(c)(1) and (2), sets forth the manner in which the Secretary shall issue regulations in response to food additive petitions filed pursuant to 21 U.S.C. § 348(b). A further subsection, 21 U.S.C. § 348(c)(3), contains what is referred to as the Delaney Amendment. It provides that no food additive shall be considered safe if it has been found to have induced cancer when ingested by man or animal.

The Delaney Amendment does not contain any specific direction as to the level of dosages producing the carcinogenic response, an omission which was lamented by HEW officials who testified before the court. When the carcinogenic response is found only upon ingestion of extremely high doses having no parallel in realistic

estimates of human consumption, the statute nonetheless precludes the approval of a petition for use of the substance. Moreover, the restriction applies where the carcinogenic response is found only in animals, even where the data may be inapplicable to humans.[7] Nonetheless, whatever the shortfalls of the statutory provision, its terms are clear.

It also should be noted that the amendment applies only (1) to actual findings of a carcinogenic response; (2) to findings based on tests which are appropriate for the evaluation of the safety of food additives (and therefore not on test results which are neither probative nor statistically significant); (3) to findings of carcinogenic response upon ingestion (rather than upon implantation or other technique); and (4) only to the specific additive which has been found to produce the carcinogenic response.

### Food Additives and Sua Sponte Regulation

A substance on the market for a limited purpose or to a limited extent may, over time, become used for more general purposes and to a greater extent than originally intended. Scientific knowledge may evolve and such changes may warrant reconsideration of the conditions of use which the FDA previously prescribed.

In the case of food additives, the Secretary may, *sua sponte*, propose the promulgation of a regulation. He shall publish his proposal, and, no sooner than 30 days thereafter, may publish a final regulation. *See* 21 U.S.C. § 348(d). The FDCA provides administrative procedures to contest such regulations (with ultimate judicial review) under the same standards applicable to a regulation issued on a food additive petition.

---

**7.** The Delaney Amendment's proscription is perhaps most practicable where the carcinogenicity is known at the time of the initial request for approval. When carcinogenicity is detected only after a substance is established in the market, some additional discretion (absent any imminent threat to public health) to allow contin- ued use to meet consumer demand, until alternatives are available, may be advisable. Note, for example, the series of congressional amendments to the FDCA necessary to permit continued marketing of saccharin, notwithstanding findings of its carcinogenicity.

There is no specific provision for *sua sponte* regulation of new drugs absent a new drug application.[8] But, after notice and opportunity for hearing, the FDCA permits revocation or withdrawal of previously approved new drug applications. *See* 21 U.S.C. § 355(e).

The regulatory authority regarding food additive petitions and new drug applications, and general authority to promulgate regulations per 21 U.S.C. § 371(a), allows the agency to regulate the introduction of substances into the market on a broad industry-wide basis, rather than on a case-by-case basis limited to individual enforcement actions.

A circumstance which led to *sua sponte* FDA action arose in the context of megadose vitamins and precipitated the case of *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688 (2d Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). Vitamins A and D had been marketed in dosages designed to provide nutritional supplements and had not been regulated as drugs. However, manufacturers began marketing megadosages designed to enhance health and to prevent a variety of diseases. Given this new use, the agency surveyed a great deal of scientific literature and data and concluded that: (1) its jurisdiction was warranted under the definition of new drug; and (2) regulation was necessary in view of possible toxic effects of excessive dosages. The agency's authority (under 21 U.S.C. § 371(a)) was upheld, and the matter was remanded for further examination of the statement of the agency's reasons for such regulation and an examination of the record to determine if that action was arbitrary, capricious, or contrary to law. *See also Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

### E. GRAS Substances

Some substances are "generally recognized as safe" (GRAS) within the community of qualified scientists. This consensus may be based on scientific data or, for substances commonly used in food before 1958, it may be based on prior use. GRAS substances are excluded from the FDCA's definition of "food additives". 21 U.S.C. § 321(s); *see also* 21 U.S.C. § 321(p) (exclusion of "new drug" generally recognized to be safe and effective). Hence, they are outside the FDA's corresponding regulatory jurisdiction.

A controversy over the GRAS status of a substance may arise in at least two ways. First, the agency might attempt to enforce the statute by initiating appropriate enforcement action in an individual case. Absent previous deliberation and regulation by the FDA, the marketer may assert that the substance is GRAS and have the question fully adjudicated by the courts. *See, e.g., Durovic, supra; Tyler Pharmacal Distributors, supra.* (Where agency regulation is contemplated, the courts may await such determination and channel any review thereof through the procedures provided in the FDCA. *See, e.g., Bentex Pharmaceuticals, Inc., supra; Cibra Corp., supra.*)

Second, the agency might attempt to regulate the use of a substance by first classifying it as a food additive or new drug. Authority for such a regulation is found under 21 U.S.C. § 371(a). In brief, such regulation must first be issued as a proposal, followed by comment by interested parties. When the final regulation is issued it must be accompanied by a sufficiently specific statement of reason to permit judicial review; any review would be based on the arbitrary and capricious standard. A court might then be asked to determine whether the FDA's classification of the substance as a food additive or new drug (and its failure to accord GRAS status) was arbitrary, capricious, or contrary to law.[9]

---

**8.** With respect to new drugs, the authority to issue *sua sponte* regulations stems not from the specific provisions directed to these substances but rather from the agency's general authority to promulgate regulations for the efficient enforcement of the FDCA. 21 U.S.C. § 371(a).

**9.** As a second line of defense, the FDA might attempt to seize any product marketed contrary

Both scenarios summarized above contemplate a situation in which the agency feels that regulation is appropriate and that the substance is not entitled to GRAS status. Where the FDA regards a substance as GRAS, it has attempted to ease market uncertainty and administrative burden through promulgation of its GRAS list.

### FDA GRAS List

In 1958 the FDCA was amended. Thereafter, "food additives" required the FDA's approval for use in interstate commerce. The agency anticipated receipt of a vast number of petitions for use of such substances. The agency further recognized that many such substances then in use would be entitled to GRAS status and exemption from regulation. The agency did not desire to have marketers submit hundreds of petitions for use of these GRAS substances.

In late 1958, under its general authority of 21 U.S.C. § 371(a), the FDA proposed to issue a regulation listing those substances it believed were entitled to GRAS status. The agency invited and received numerous comments in response to this proposal. After consideration, the FDA promulgated a final regulation embodying its GRAS list in late 1959. This list embodied some changes from the original proposal based on the comments received in response to the FDA's regulation.

The agency also promulgated procedural regulations which provided that no change in the GRAS list would be made without prior notice and a statement of reasons for

the action. 21 C.F.R. §§ 121.3(b) and 121.-101.[10] Amendments to the GRAS list are frequently accompanied by additional regulatory action which requires compliance with the procedural provisions of the Administrative Procedure Act, as is subsequently discussed. The regulation under review here contained such additional provisions.

By statutory definition, a substance on the GRAS list is not subject to FDA regulation. Accordingly, no enforcement action (or seizure) against such a substance, on the ground that its presence in the market without prior approval by the agency violated the statute, would be appropriate. Similarly, the agency could not promulgate regulations classifying the substance as one over which it had jurisdiction (or prescribing conditions for its use), so long as the substance appeared on the agency's own list of substances it regarded as having and being entitled to GRAS status.[11]

As the preamble to the agency GRAS list states, the listing was not intended to be exhaustive of all substances which were in fact entitled to GRAS status. (Rather, in its initial promulgation, the proposed list represented those substances which came readily to mind as warranting GRAS status. Omission of a substance from the list was not tantamount to a finding that the substance did not have GRAS status, but might merely reflect the agency's uncertainty of the status of the substance within the scientific community.) In any event, if the agency attempted, with respect to sub-

---

to such regulation and classification. A challenge to the validity of the regulation should be raised in the regulatory context rather than in an enforcement action. *See Bentex Pharmaceuticals, Inc., supra; Ciba Corp., supra.*

**10.** In this action we are not concerned with the procedures instituted *after* October 1969, with respect to the GRAS list, or "affirmed-as-GRAS" list. (These procedures, it is noted, included submission of the question to a panel of scientists which would then report thereon to the agency.)

**11.** Some substances have been included on the GRAS list only to the extent of certain tolerance levels, in certain form or combinations, or for

certain uses. To the extent included in the GRAS list, the substance is not subject to agency regulation; to the extent excluded from the list, it would be. Thus, while a given substance, broadly defined, could both be on the GRAS list and subject to regulation, a particular tolerance, form or combination, or use of the substance could not simultaneously be both on the GRAS list and subject to regulation within the statutory definitions. Defendant's contention to the contrary is rejected. The Hearing Officer has been provided with no indication that the agency ever attempted to take enforcement or regulatory action with respect to a substance included on the GRAS list.

stances which it did *not* include on its GRAS list, to either (1) seize a product or otherwise enforce the statute or to (2) issue a regulation classifying a substance as a food additive or new drug within the agency's regulatory jurisdiction (or to further promulgate a regulation prescribing the conditions for the use of such substance), the marketer was free to assert that the substance was indeed GRAS within the scientific community.

The status of substances, or their combination, form, use, and so forth, may change over time given new scientific data and the state of the technological art. Where appropriate, amendment to the GRAS list might then be effected in accord with applicable procedural requirements. For example, prior to the time here in issue, the agency proposed to issue a regulation which would delete the substance NDGA from its GRAS list. The proposal was published allowing a period of notice and an opportunity for interested persons to comment. Comments were received and reviewed, and the final regulation was issued several months later.

Such regulation might merely delete a substance from the GRAS list without more provisions. In that situation, the amendment to the GRAS list might merely reflect the FDA's uncertainty as to the GRAS status of the substance. The agency might take no further action at that time. However, while the status of the substance might thus remain open, the use of the substance would be subject to agency enforcement or regulation. The situation presented by NDGA, however, represents the more common practical phenomenon. There, in addition to proposing to remove the substance from the GRAS list, the agency also proposed to classify it as a "food additive" within the statutory definition. The use of the substance in interstate commerce would then be subject to agency regulatory jurisdiction.

Such classification represents the same type of regulatory action taken with respect to megadose vitamins, discussed above. As such, it must comply with the procedural requirements of the FDCA as well as the Administrative Procedure Act, discussed below. *See also Dow Chemical, supra; Nova Scotia Food Products, supra.* Regulations which prescribe the conditions of use of the classified substance, such as might be issued *sua sponte* with respect to food additives pursuant to 21 U.S.C. § 348(d), are also subject to the provisions of the FDCA with respect to procedures and judicial review, as have been discussed at length above.

### GRAS Listing and Food Additive Petitions

The presence of a substance on the GRAS list was a recognition by the agency that the substance was outside the ambit of its regulatory authority. Given that circumstance, it would be wholly unnecessary for a marketer to file a food additive petition for the use of a GRAS-list substance. Indeed, such filings would be contrary to the agency intent in promulgating the GRAS list, would place an undue burden upon the agency, and would most likely be summarily denied as moot.

Moreover, marketers of these GRAS substances need not file multiple and perhaps wholly unnecessary "protective petitions" in the fear that a substance will be suddenly removed from the agency's GRAS list, given the agency's assurance (through its procedural regulations) that no such action will be taken without prior notice and an opportunity to comment.

In view of the foregoing, the Government's contention that the plaintiff should have filed a food additive petition even before the promulgation of the October 21, 1969, regulation now in issue, and should have thus protected itself or, failing to take such protective actions, should now bear the burden of such failure, is extremely wide of the mark.

### F. Treatment of Cyclamates

Since 1950 cyclamates had been recognized as a new drug under the FDCA. A new drug application had been submitted by Abbott Laboratories and approved by the FDA.

In the early 1950s, cyclamates were considered as an ingredient of foods for special dietary use (by those who must restrict their intake of nutritive sugars such as the diabetic and obese). *See* 21 U.S.C. § 343(j). The agency promulgated regulations for the labeling of such products. The labels were designed to inform the consumer of the use of the non-nutritive sweeteners. *See* 21 C.F.R. § 125.7.

In 1958 the FDCA was amended to include specific provisions concerning "food additives", the definition of which would extend to cyclamates as they were then used but for the statutory exemption for GRAS substances. Cyclamates were regarded by the agency as GRAS in 1958 and were included on the agency's GRAS list. Cyclamates retained this status in the eyes of the agency until 1969, and were not regulated as food additives prior to that time.

In approximately 1962, the use of cyclamates and other non-nutritive sweeteners gained popularity with not only those who, for medical reasons, must restrict their intake of nutritive sugars, but also by those who wished, for cosmetic reasons, to control their weight. During this period the labeling requirements for the artifically-sweetened foods for special dietary use were designed to provide consumers information enabling them to distinguish between those foods containing nutritive sweeteners and those containing the artificial sweeteners.

For example, on June 18, 1966 the agency, after due notice and an opportunity for comment, promulgated a regulation amending 21 C.F.R. Part 125 concerning special dietary foods and cited, as authority to do so, the statutory provisions of 21 U.S.C. §§ 343(j) and 371(e). These regulations included 21 C.F.R. § 125.5 relating to use of non-nutritive sweeteners for use in reducing, maintaining or gaining body weight, and § 125.6 relating to use of special dietary foods by diabetics. Both focused on information concerning artificial sweeteners, including: identification of the presence of a non-nutritive sweetener; information comparing its caloric content with that of an equivalent serving made with sugar; and the quantity of protein, fat, carbohydrates, and calories in a specified serving.

On December 14, 1966, again citing its authority under 21 U.S.C. § 371(e), the agency reviewed the June 18 regulations (which were to become effective on December 15) exempting from labeling requirements certain artificially-sweetened foods. Also examined were the regulations in Part 125 concerning foods for special dietary use in weight control and for diabetics. The question was whether the conditions of exemption were reasonable given the necessity to fully inform purchasers of the value of such foods. The effective date of the June 18, 1966 proposals was stayed, and additional hearings were to be held in connection therewith. On April 2, 1968, the FDA issued a notice of the hearings to be held concerning the December 14, 1966 promulgation.

At that time, cyclamates were used not only in solid food products such as canned fruits and vegetables (in which saccharin was not useable because of the application of heat in processing) but also in soft drinks and beverages. The consumption of artifically-sweetened soft drinks increased over the years, and by 1969 had become common. As a result of this increased pattern of use, the agency determined in April 1969 to propose additional regulation.

On April 5, 1969, the agency again promulgated a proposed regulation and invited interested parties to comment. This proposal was directed to the use of cyclamates in a large number of foods, but not in the same quantities. Noting that current regulations did not place limits on many of these uses, and current labeling practices were not regarded as sufficient to provide consumers with enough information to enable them to safely use the cyclamate-containing products, the agency proposed further label requirements.

Specifically, it was proposed that labels on cyclamate-containing food products set forth the number of milligrams of cyclamate contained in a standard serving (or in the case of beverages, in the entire contain-

er) and the maximum recommended daily intake levels of cyclamates (3500 milligrams per day for adults and 1200 for children). In addition, the proposal sought to establish a limit on cyclohexylamine content (25 parts per million of cyclamate) and prescribed an analytical method to determine that content.

The FDA's proposed regulation continued by proposing that pending the issuance of a final order on this proposal, the provisions of 21 C.F.R. § 125.7 (concerning food for special dietary uses) would be in effect. The agency noted that it would refrain from recommending regulatory proceedings under the Act with respect to food containing cyclamates and labeled under 21 C.F.R. § 125.7 so long as the product labels contained the information referred to in the proposal.

The authority cited as the basis for this proposal was 21 U.S.C. § 348(d) (concerning "food additives"). However, cyclamates were regarded by the agency as GRAS and there was no proposal to amend the list to delete or modify that status. As GRAS substances, cyclamates were not subject to regulation as "food additives". Accordingly, better authority would be found in 21 U.S.C. §§ 343(j) and 371(e) (concerning foods for special dietary uses) which had been relied upon in proposing similar regulations. No final regulation was issued pursuant to this proposal and the next agency promulgation of concern here was on October 21, 1969.

In the October 21, 1969 promulgation, the agency determined to amend its GRAS list as to delete cyclamates, and to regulate future use of cyclamates as "new drugs". This promulgation and its treatment of cyclamates is the primary area of controversy in this case.

## II. *The Administrative Procedure Act* [12]

The parties have expended considerable effort in arguing whether the regulation in

issue falls within or outside the procedural requirements of the APA. *See* 5 U.S.C. §§ 553, 701–06 *inter alia.* Many sections of the FDCA contain detailed requirements as to the procedures to be followed in the issuance of a regulation prescribing the conditions of use of a food additive or new drug. In addition, the FDCA provides, that the Secretary has general authority to issue regulations for the efficient administration of the statute, 21 U.S.C. § 371(a). It does not specify procedures for promulgation of this type of regulation.[13] It is this general authority, rather than the more specific provisions of the FDCA, with which we are here concerned.

In *National Nutritional Foods Association v. Weinberger,* 512 F.2d 688 (2d Cir.), *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975), a case involving facts not altogether dissimilar from those in the instant case, it was held that the type of regulation issued pursuant to 21 U.S.C. § 371(a) was subject to the requirements of the APA. In that case, the use of vitamins A and D had gone beyond a mere nutritional and dietary supplement. Certain manufacturers were marketing megadoses of the substances as an enhancement to health. The FDA determined that such intended use rendered the substances a "new drug" warranting administrative regulation, given the toxicity of excessive dosages. Accordingly, the agency determined that pursuant to the general grant of authority to promulgate regulations (*sua sponte*) in 21 U.S.C. § 371(a), it would issue such a regulation. Again, that provision of the FDCA contains no procedural requirements. Nonetheless, when the FDA promulgated its proposal it provided a period of notice and an opportunity for comment.

In upholding the FDA's exercise of authority, the court noted specifically that

---

12. The courts in the judicial circuits in which plaintiff could have sued have held that the APA is an independent jurisdictional grant. *See, e.g., Brandt v. Hickel,* 427 F.2d 53 (9th Cir.1970);

*Pickus v. United States Board of Parole,* 507 F.2d 1107 (D.C.Cir.1974).

13. 21 U.S.C. § 371(e) provides procedures for limited circumstances not relevant here.

distinctions between "substantive" and "interpretive" regulations "have been rather unrewarding". *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688, 696. Instead, the court looked at the impact of the proposed regulation, found that it had the force and effect of the law [14] and, as such, must be promulgated in accord with the provisions of the APA calling for notice and opportunity to comment. 5 U.S.C. § 553(c).

The standard of review in proceedings requiring notice and opportunity for comment is whether the action is arbitrary, capricious, or contrary to law.[15] Judicial review of regulations issued pursuant to the general grant of authority in 21 U.S.C. § 371(a) lies essentially in the district courts.[16]

Moreover, the final statement of administrative decision must include a statement of the reasons for its regulation. Where such statements are missing or where the data is known only to the agency and hence cannot form the basis for meaningful comment by interested parties, the regulation may be procedurally defective or its issuance may be found to be arbitrary and capricious. *See, e.g., National Nutritional Foods Association v. Weinberger, supra* at 701; *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240 (2d Cir.1977) [17].

## III. *The Federal Tort Claims Act Generally*

The TCA (28 U.S.C. §§ 2671–2680 (1982)) provides that a tort action may be brought against the United States as if it were a private party. Certain exceptions are set forth in 28 U.S.C. § 2680(a) including:

(a) Any claim based upon an act or omission of an employee of the Government, *exercising due care*, in the execution of a statute or regulation, ... or based upon the exercise or performance (or the failure to exercise or perform) *a discretionary function* or duty on the part of a federal agency or an employee of the Government .... [Emphasis added.]

The parties disagree over whether the functions exercised by the agency here were "discretionary" and hence outside the scope of the TCA. As a general matter, some clear lines can be drawn, against which the instant case can be measured.

Discretionary functions are seen most clearly where, for example, an agency has authority to regulate the issuance of licenses, and must therefore consider factors of health and safety. Setting standards that will be considered "safe" may well be discretionary. For example, in determining what levels of vision are appropriate in granting licenses to pilots, the agency may well exercise its discretion, subject to any requirements in the governing substantive legislation.[18]

**14.** The court referred, *inter alia,* to *Weinberger v. Hynson, Westcoff & Dunning, Inc., supra, Ciba Corp. v. Weinberger,* supra, and *Weinberger v. Bentex Pharmaceuticals, Inc., supra.*

**15.** Use of the "substantial evidence" test on review applies where the administrative proceedings include an evidentiary-type hearing required by the terms of the substantive statute; here, the FDCA · (*e.g.,* 21 U.S.C. §§ 348(f) or 355(c)(2)), or the APA (5 U.S.C. §§ 556, 557).

**16.** *See* cases cited in text; *see also Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Eisenstadt v. Finch,* No. 70–C–42 (E.D.N.Y., June 23, 1970) (wherein jurisdiction in the courts of appeals under 21 U.S.C. § 348 was held to take precedence).

**17.** The circumstances surrounding the issuance of the regulation in *Nova Scotia* were somewhat dissimilar from those present in the instant

case. Nonetheless, defendant cites this case as authority for the proposition that an interested party such as plaintiff can seek judicial enforcement of a requirement that the agency set forth in full its statement of reasons and that the underlying data be available for examination by those seeking to comment on the proposed regulation. The court agrees that such requirements should pertain to a regulation issued under 21 U.S.C. § 371(a). The regulation here in question was, at least in part, issued under such statutory authority.

**18.** In the case of the FDCA, agency determinations must not be arbitrary, capricious or contrary to law or, under appropriate circumstances, must be based on a fair evaluation of all the evidence of record, and are subject to judicial review as appropriate.

Moreover, in the instant case, the Delaney Amendment contained in 21 U.S.C. § 348(c)(3)

However, once having exercised discretion in determining such standards, as in the example above relating to the vision necessary for safe licensing as a pilot, there is no discretion involved in ophtalmologic examinations to ascertain an individual's vision. There, regardless of whether certain medical, scientific, or technical knowledge or judgment is involved, the conduct of the evaluation is a function not involving discretion but rather requiring due care.[19] *See Hendry v. United States,* 418 F.2d 774 (2d Cir.1969); *Griffin v. United States,* 500 F.2d 1059 (3rd Cir.1974); and *Beins v. United States,* 695 F.2d 591 (D.C.Cir.1982).

An appropriate avenue for contesting the propriety of agency action, under the substantive legislation or the APA, is to seek to set it aside or have it vacated. This would be the case where the action is allegedly arbitrary or, under appropriate circumstances, not supported by the record.

These remedies do not contemplate monetary damages. Where the FDA has failed to exercise due care in reaching an erroneous determination, additional remedies lie under the TCA for money damages. *Beins, supra,* at 597–99.[20]

Moreover failure to pursue APA remedies to set aside the agency action does not bar a tort claim; rather, the judge may take into account what effect (if any) the remedies would have had in relation to the damages claimed under the TCA, particu-

larly in quantifying any award. *See Id.* at 598–600.[21]

Thus, there is nothing in the terms of the FDCA or the APA, as applicable to the facts of the instant case, which would, on their face, preclude consideration of a general tort claim under the TCA. Moreover, in a Congressional Reference case, even the exception for discretionary functions might be waived, although reluctantly. *See Armiger v. United States,* 168 Ct.Cl. 379, 385 n. 3, 339 F.2d 625 (1964). Hence the TCA will also be examined.

### Slander

The FDCA permits the agency to publicize reports of ongoing studies or investigations. The FDA may also publicize results of outside studies when they suggest an imminent threat to public health or safety. 21 U.S.C. § 375(b). It is of course appropriate to assume that the Government will be accurate in this publicity.

There is nothing in the FDCA which provides for relief from the effects of adverse publicity by the Government. That matter is addressed in the TCA. Adverse publicity, if inaccurate, might be actionable against a private party as slander or, more appropriately to the context here, product disparagement.[22] However, the TCA clearly provides that slander is an exception to the Government's waiver of sovereign immunity and thus the Government is exempt from such suit.

---

substitutes legislative dictate for agency discretion in providing that no substance shall be deemed by the agency to be safe if it has been found to have induced cancer when ingested by man or animal.

**19.** The circumstances of the instant case are discussed elsewhere. Here, however, it may be helpful to draw the following distinction. It may be discretionary (subject to the provisions of the FDCA) to determine that a certain level of toxicity or the production of a certain concentration of lesions will render a substance "unsafe"; it is not an exercise of a discretionary function to test a particular substance in order to determine its level of toxicity or the number of lesions produced. In these non-discretionary areas, the exercise of due care is required.

**20.** Any failure to exhaust the administrative remedies in the TCA itself may be taken into

account in considering the extent of recoverable damages, if any, particularly in the context of an equitable claim. It does not act as an outright bar to recovery.

**21.** No tort claim for money damages shall lie for the violation of any procedural requirements. *See Jayvee Brand Inc. v. United States,* 721 F.2d 385 (D.C.Cir.1983).

**22.** The Government argues that if it had not released the findings of the Oser Study, Abbott Laboratories would have. That contention is irrelevant. We are here concerned with what the Government actually did. (It is noted, however, that statements released by Abbott appear to more accurately describe the study and its findings than did that of the Government.)

Sovereign immunity can be waived in a Congressional Reference proceeding and allow recovery for the tort of product disparagement. *See, e.g., Marlin Toy Products v. United States,* 218 Ct.Cl. 630 (1978). That alone, however, does not address the circumstances of this case. In *Marlin Toy,* the publicity concerned a particular product of a particular company erroneously described as defective. In the instant case, the publicity related to cyclamate substances generally, and did not disparage plaintiff or its particular products in any way. Thus, the statements lacked the specificity requisite to a tort claim of this nature. *See, e.g., Ajay Nutrition Foods, Inc. v. FDA,* 378 F.Supp. 210 (D.N.J.1974) *aff'd mem.* 513 F.2d 625 (3d Cir.1975); *see also Smith-Victor Corp. v. Sylvania Electric Products,* 242 F.Supp. 302 (N.D.Ill. 1965); *Sims v. Mack Truck Corp.,* 488 F.Supp. 592 (E.D.Pa.1980); and *Lance Industries v. United States,* 3 Cl.Ct. 762 (1983).

### Misrepresentation

Claims against the Government for alleged misrepresentation are also excluded from the TCA. This sovereign immunity can be waived or set aside in considering a claim in a Congressional Reference action. *See, e.g., Mizokami v. United States,* 188 Ct.Cl. 736, 414 F.2d 1375 (1969) (wherein a special jurisdictional act was enacted by Congress); *see also Ralph Feffer and Sons v. United States,* 166 Ct.Cl. 506 (1964) (involving the representations about the viability of cottonseeds); *O'Donnell v. United States,* 166 Ct.Cl. 107 (1964) (involving representations of a product's conformity with import laws of a foreign country); *Cuyahoga County, Ohio v. United States,* 155 Ct.Cl. 307, 294 F.2d 775 (1961) (involving representations that taxes on condemned land would be paid and wherein recovery was reduced by reason of contributory negligence); and *Lance Industries v. United States,* 3 Cl.Ct. 762 (1983).

The element of reliance by the plaintiff must be present in claims of misrepresentation. *See* cases cited above; *see also Ware v. United States,* 626 F.2d 1278 (5th Cir. 1980). If plaintiff relies upon the misrepresentation to its detriment, a claim of misrepresentation may lie. The sovereign immunity preserved by the TCA for claims of misrepresentation would then bar recovery at law but may be waived in Congressional Reference.

Where the plaintiff takes no action in reliance on Government action but the damage is caused by the Government itself acting upon its own negligent appraisal or diagnosis to the plaintiff's detriment, a claim may not be barred by sovereign immunity. For example, in *Ware,* the Government misdiagnosed the plaintiff's dairy cattle and then, based on that diagnosis, destroyed them. As the court there noted, all actions were taken by the Government's agents, and the Government's misrepresentation caused plaintiff to do nothing save remain in ignorance that he had suffered a compensable loss.[23] The court held that the claim was not for misrepresentation but for negligent misdiagnosis resulting in Government destruction of plaintiff's property. (*Cf. Biens v. United States,* 695 F.2d 591 (D.C.Cir.1982).)

The questions relevant to the instant case are whether the Government misrepresented the status of cyclamates with respect to its GRAS status, its drug status, or its carcinogenicity, taking into account the then known scientific data. These questions are addressed in the Opinion. Of equal import, however, is the question of whether the element of reliance is here present—that is, whether plaintiff acted to its detriment in reliance on the Government's representations.

In the case of the events between October 1969 and September 1970, and the decline in sales during that period which resulted in injury to plaintiff, it should be noted that plaintiff did not act. The representations and characterizations were an-

---

**23.** The court held that the statute of limitations did not begin to run until plaintiff obtained knowledge of the negligent misdiagnosis by the Government.

nounced by the Government in October 1969. Plaintiff did not remove its product from the market at that time or for the year thereafter. Plaintiff did not reduce its price or otherwise act in reliance on the Government's representations so as to incur injury. It was the Government which ordered the recall of the products on September 1, 1970 (just as if it had seized or destroyed the product), and plaintiff agreed (but not voluntarily) to remove its product from the market only so as to comply with the law.